# JUNE, 1918

### ALFRED WILKIE v. THE STATE.

No. 4435.   Decided June 5, 1918.

Motion for rehearing denied June 5, 1918.

**1.—Murder—Circumstantial Evidence—Insufficiency of Evidence.**

Where, upon trial of murder, the conviction depended purely upon circumstantial evidence, which was not sufficiently strong to exclude every reasonable hypothesis except the guilt of the accused, who was convicted of murder, the conviction can not be sustained.   Prendergast, Judge, dissenting.

**2.—Same—Motive—Rule Stated.**

In the trial of a criminal cause it is not always necessary to show motive, yet if existent it is a circumstance to be considered by the jury in connection with the other facts, and the cogency of motive is also to be determined by the evidence.

**3.—Same—Circumstantial Evidence—Rule Stated—Presumption.**

It is the duty of the State to make out its case, and it is not encumbent upon the defendant to prove a case for the State, as he is clothed with the presumption of innocence, and in case of circumstantial evidence the same must exclude every reasonable hypothesis except that of the guilt of the defendant, and failure by the State to make a case does not raise the presumption of guilt against the accused, and inferences and deductions from failure of proof must be taken in favor of defendant.

**4.—Same—Motive—Case Stated.**

Where, upon trial of murder, the State's theory on the question of motive was based upon the fact that defendant owed his mother-in-law a large sum of money on a tract of land, and that he was afraid that she would press him for the payment of this money, and, therefore, he killed her, is not borne out by the facts appearing in the record on appeal and simply remains a theory, and is entirely speculative, the conviction is not sustained.   Prendergast, Judge, dissenting.

**5.—Same—Burden of Proof—Presumption of Innocence.**

The burden of proof is not on the defendant to prove his innocence or to account for facts that can be proved by the State and the instant case is not one of those cases where deductions adverse to the defendant can be made for not disclosing facts exclusively in his possession, and the burden is upon the State to prove its case.

Appeal from the District Court of Guadalupe.   Tried below before the Hon. M. Kennon.

Appeal from a conviction of murder; penalty, twenty years imprisonment in the penitentiary.

The opinion states the case.

*J. W. Woods, J. A. Hanley,* and *E. Blackwood,* for appellant.

*E. B. Hendricks,* Assistant Attorney General, and *Will G. Barber* for the State.—Cited Wragg v. State, 65 Texas Crim. Rep., 131, 145 S. W. Rep., 342; Burnan v. State, 61 Texas Crim. Rep., 616, 135 S. W. Rep., 1175; Gomez v. State, 75 Texas Crim. Rep., 239, 170 S. W. Rep., 711, and other cases.

DAVIDSON, PRESIDING JUDGE.—Appellant was convicted of the murder of Mrs. Dorathea Fischbeck, his mother-in-law, and given twenty years in the penitentiary.

The case is one purely of circumstantial evidence  There are quite a number of bills of exception reserved to the rulings of the court. We have not entered into a discussion of these under the view we take of the sufficiency of the evidence. The proposition with reference to the sufficiency of the evidence as applied to cases of circumstantial evidence is so well settled by so many decisions it is useless to discuss the legal aspect further than to state the evidence must be sufficiently strong to exclude every reasonable hypothesis except the guilt of the accused. Motive is not always necessary, yet if existent is a circumstance to be considered by the jury in connection with the other facts. The cogency of the motive is to be determined also by the evidence. If there be motive in this case it is found under the following statement: Appellant had bought from Mr. Fischbeck during his lifetime a tract of land for which he gave his note for $11,000 as unpaid purchase money. This was due in January after the homicide on the 5th of December. Mr. Fischbeck had died in June before the homicide of his widow in December. The contention of the State is that appellant was anticipating trouble with his mother-in-law, who was left the sole heir by the will of her deceased husband; that he might be pressed by her on account of the unpaid purchase price. Evidence was introduced that something like six weeks prior to the homicide appellant and his wife visited Mrs. Fischbeck, and there were conversations between Mrs. Wilkie, wife of defendant, and her mother, Mrs. Fischbeck, in which appellant did not directly engage; that his wife would talk to her husband, and then to her mother not in the presence of each other, but these matters seemed to have been settled, and appellant and his wife remained at the residence of Mrs. Fischbeck at least one night, and their relations seemed to be pleasant. So far as the record shows there was nothing to break this pleasantness after this visit; also this was the last visit that appellant and his wife paid to his mother-in-law, the deceased. There is but little, if any, evidence, that would seem to justify the conclusion that Mrs. Fischbeck, deceased, intended to press her son-in-law for this money. On the evening prior to the homicide at night appellant and a Mexican left his home in the edge of Caldwell County and went to the village

of Martindale, reaching there about sunset, and from there they went to another village called Limerock. He and the Mexican, Pena, were in a hack. The evidence is not clear as to the exact time the parties left Limerock, but the preponderance of the evidence indicates it was about or later than 9 o'clock. Some of the evidence is positive that it was about 9:30 o'clock. It was about three miles from Limerock to the point where it is claimed appellant got out of the hack, the scene of the homicide being something like one-half mile from where the hack is supposed to have stopped. The killing occurred along about 9:30, at least between 9 and 10 o'clock. It had been raining, and the country was black land and muddy. There are a great many statements by the Mexican, Pena, who subsequently turned State's evidence, or at least testified for the State, to the effect that appellant did not have a gun in the hack with him, and that on their return home from Limerock they did not stop at any point. These statements of the Mexican were reiterated to different people and officers. Subsequently, however, for some reason, he changed his testimony and on the trial testified that he and appellant did stop the hack; that appellant got out and for the first time he saw a gun which appellant got out of the bottom of the hack and go away; that he was gone a while and returned. There is other testimony showing appellant did not have a gun in the hack, and also testimony by his wife and daughter to the effect that he owned but one gun and that it remained at home and his wife used it in hunting that evening. From this point on the State's case hangs mainly around tracks. From where the hack is supposed to have stopped to the place of the homicide no foot tracks were found until within a short distance of the residence of Jechow, where Mrs. Fischbeck was shot. Near that house was found the next morning barefoot tracks. Appellant was wearing shoes. These barefoot tracks went close to the house and left in a different direction from their approach. After leaving the house these tracks crossed a lane and muddy low place, going in the direction of where Mexicans resided. The tracks seemed to have been lost at this point. Barefoot tracks resembling those found near the residence of Jechow were later found some seven or eight hundred yards from the scene of the homicide inside on the farm of a Mr. Bauerschlag. These tracks went within a short distance of the gate of Mr. Bauerschlag and were lost. There were no measurements of the tracks, and no measurements of defendant's foot, and the only testimony that indicates it might have been the bare foot of appellant was that the tracks indicated a large foot and that appellant wore about a No. 9 or 10 shoe. There is evidence that at a certain wire fence someone went through the fence and evidently got on the ground with one knee. There was a hole found in the ground on the opposite side from where the party was getting through the fence. The State relied upon this hole as one of the circumstances against appellant because the gun had mud on it. Witnesses testified this hole might have been made by a gun or stick, or anything of that sort that could have made such a hole. What time

appellant reached home 'that night is not clear, but about 2 o'clock parties went to appellant's house and arrested him and the Mexican. At the time they reached appellant's home he was hitching his team to the hack to take his wife and daughter to the scene of the death of his mother-in-law, he having been advised of her death over the phone. Appellant and the Mexican had no way of communicating with each other after the arrest that night out of the hearing of the officers. They were taken prisoners and kept prisoners from that time. They were in the custody of the officers, and were carried that night to the scene of the homicide and thence to jail. Appellant's wife and daughter testified that he did not have his gun with him on this occasion, and that his wife used it in shooting birds that evening and got a little mud on it. The officers testified that on the barrel of the gun they found a small quantity of mud or black dirt.

We are of opinion that this evidence does not show, under the rules of circumstantial evidence, that appellant and no one else killed deceased. Whoever did the killing the facts show that they did it by going to the house and making a noise which attracted the attention of those inside, who were deceased, Jechow and his wife, the youngest daughter of deceased, at whose house she was waiting for the return of her two sons, who lived with her in her residence something like one hundred or more yards away. It would hardly be questioned under the circumstances stated that the party who shot Mrs. Fischbeck was guilty of a cold-blooded assassination. She was an elderly lady, and when she went to the door was shot to death by an assassin from the outside. The jury evidently more than seriously questioned the guilt of the defendant else this verdict for twenty years would scarcely have been rendered. This evidence does not exclude every reasonable hypothesis except the guilt of the defendant. Outside of the witness Pena's testimony there is nothing to show that appellant had a gun, and Pena denied this fact for quite a while after being placed in jail. Other witnesses testified, who seemed to have noticed the hack, that appellant did not have a gun with him that evening. His wife and daughter also testified that he did not have a gun. If appellant left the hack with the Mexican and went away half a mile to the scene of the homicide, the land being black and muddy, he could have been traced, or ought to have been traced by foot tracks. He was wearing shoes. There is nothing to indicate that he got rid of these shoes and became barefooted, or when he again placed those shoes on his feet. If he left the hack with the shoes on he had to get rid of them at some point before reaching the house where the homicide was committed, if he fired the shot. There is no attempt to account for this by any fact or circumstance. The Mexican does not attempt to account for it, and no physical facts on the ground are put in evidence in this connection. In fact, the tracks were only seen near the house where the homicide occurred going to and from it barefooted. The fact the party getting through the fence got on his knee in going through and there was a hole found that in-

dicated it might have been made by a gun or a stick might be a circumstance, if connected properly. The fact that there was a hole made in the ground would not indicate that defendant made it, nor that a gun made it. To say that that hole in the ground was made by a gun would be but a presumption, and to say that it was appellant's gun would be another presumption without basis. One presumption based upon another presumption and both presumptions based upon facts that are hardly tangible ought not to form the basis of a link in a chain of circumstances. Presumptions can not form basis for other presumptions. There is another fact that could have been proved if true, and no reason is assigned why it was not proved. The party who went to the house unmistakably and unquestionably went through black muddy soil, and on leaving through a lane and a low place where mud was soft and something like knee deep. The party who made those tracks and went through these muddy places evidently carried some of the mud away on his person and clothes. This record is silent with reference to that matter. Appellant was arrested about 2 o'clock that night. There was no attempt at any time to investigate his clothes as to this matter. There was nothing to indicate that there was mud on his clothes, and no account given why this phase of the case was not investigated. It was one of the most, if not the most, important of the facts connected with the tracing of the guilty party. There was no attempt, so far as this record goes, to show from any source whether or not appellant's clothes were muddy, or his feet were muddy, or his shoes were muddy, or that he was in any way shown to have been in position to have made the tracks and gone through the mud that the assassin evidently and necessarily did. The record is very voluminous, and deals a great deal in matters unnecessarily prolix, but the salient features are about as stated. We are not satisfied that this evidence excludes every reasonable hypothesis except defendant's guilt, and especially in view of the fact that existing facts shown by this record could have been proved or accounted for in some way that would have tended to identify the guilty party. It might be suggested in this connection also that so far as motive is concerned one of deceased's sons might be equally charged with motive. He had forged her name to a check, and she had stopped its payment and ordered the bank not to accept any more checks unless she signed them. This son is shown by this record to be a fugitive from justice. It may be that he was not running from guilt with reference to this matter. It is also shown that this son employed two Mexicans to kill appellant subsequent to the death of his mother. They undertook it. Appellant killed one of them, and the other went to the penitentiary, and the son got out of jail and became a fugitive.

There is another circumstance which tends to weaken the State's case, and it is this: The evidence shows that appellant had not visited his mother-in-law's residence since some time in October, about six weeks or such matter prior to the homicide, and the evidence fails to show that he was aware of her habits and custom at night when her sons

were away from home, two of whom lived with her at her home. It is not shown that he knew that his mother-in-law was not at home that night but at her son-in-law's, Jechow. The assassin must have had some knowledge of these facts because there is nothing to indicate that the slayer went to her residence but that he went direct to Jechow's residence. Take the case as it stands, we are not satisfied to affirm this judgment on this testimony, and especially in view of the fact that many things could have been proved if they applied to defendant which were not proved. Some of them have been mentioned. It is thought unnecessary to go further into detail.

Because the verdict is not supported under the rules of circumstantial evidence this judgment will be reversed and the cause remanded.

*Reversed and remanded.*

PRENDERGAST, JUDGE.—I can not agree to this reversal. I am of the opinion the evidence is amply sufficient to meet every requisite of circumstantial evidence, and to show that appellant and no one else killed deceased.

ON REHEARING.

June 5, 1918.

DAVIDSON, PRESIDING JUDGE.—The contention of the State on the original submission and on the rehearing, as we understand, was that the State's case would have been stronger had it been shown that appellant had mud on his person and clothes on the night of and following the homicide. It is a basic proposition in the case that the party who did the killing walked through black muddy soil for some distance, and that some of this mud was soft and deep, so much so that tracks could not be discovered by reason of the fact the soft mud covered them. It was a very prominent fact throughout the case that such was the condition of the country about the scene of the tragedy, and that it had been raining heavily. This was testified by all the witnesses who testified in regard to this phase of the case. It was known the night of and before the homicide that this was the condition of the country. It was also known at the time of and before appellant's arrest the night of the homicide. The State undertook to follow tracks through this mud, and it is claimed that in some places where they expected to find tracks the ground was too muddy and soft to leave impression of foot tracks.

It is a fair deduction, if not an irresistible conclusion, that the party who did the killing must have had mud on his person and clothing. The State proved that appellant's gun had mud on it near the muzzle at the time of his arrest about 2 o'clock at night after the killing about 9:30 o'clock. There was no attempt by the State to show that appellant's clothing or person was besmirched by the black soil. There was no attempt to prove that he had changed his clothes after the homicide and before his arrest. Had he changed his clothing this fact could have been shown by the State, as we understand this record, from various

witnesses. The Mexican, for instance, went with appellant in the hack from his home to Martindale, thence to Limerock, and thence on his return from Limerock to his home, the place from which they started. He naturally would know or ought to have known how appellant was dressed from the time they left appellant's home until they returned that night. It would be natural for him to observe appellant's clothing on his return to the hack, if his testimony is true, and discover mud about his person if such was to be found. Yet this witness was not asked anything with reference to these phases of the case. The State's theory with reference to this witness was that he and appellant left home in the hack together, were together all the evening, and returned to appellant's home together that night. Appellant and the Mexican were both arrested at appellant's residence about 2 o'clock that night. Quite a number of witnesses also saw appellant at Martindale, some of whom talked with him and were with him. There is evidence also that a number of witnesses saw him in a saloon at Limerock and in a store at Limerock as well. None of these witnesses were questioned with reference to whether he had changed his clothing, or with reference to the fact there was any mud upon his clothes. It is true that the witnesses at Martindale and Limerock may not have seen appellant, and doubtless did not see him, after he left Limerock, but they saw him at those places in the evening and up to about 9 o'clock or later, and they saw him again early the next morning, for he was arrested at 2 o'clock and reached the scene of the homicide at 4 or 5 o'clock in the morning. The witnesses who saw appellant at Limerock also saw him under arrest at the place where the homicide occurred. They could have given evidence, if such was a fact, that his clothing had been changed. The State in its original submission and on rehearing urges that appellant's wife could have testified to whether or not his clothes had been changed, or that mud was on them inasmuch as he returned that night about 12 o'clock and she saw him, and that because his wife was not subject to examination along this line that, therefore, the jury should deduce from that that he did have mud on his clothing, and that he had changed his clothes. That she did not testify in regard to this might be a matter perhaps under the decisions that could be discussed before the jury, but this does not apply to the other witnesses, because the defendant could not close their mouths, and most of them were State's witnesses and earnest in the prosecution. Some of them were the children of deceased who were sufficiently interested to employ prominent attorneys as counsel for the prosecution. These witnesses were not questioned as to the change of appellant's clothing, and so far as this record is concerned defendant had on the same clothing when he was arrested that he had on when he left home before the tragedy. No witness in the case would have been better versed perhaps with reference to this matter than the Mexican, Pena, who was in the hack with appellant, and yet he did not see any mud upon appellant's clothing, nor does he speak of any change of clothing by appellant during the entire day or night. That he was

not asked about it is no reason why the jury should presume that appellant did change his clothing. It is the duty of the State to make out its case. It was not incumbent upon the defendant to prove a case for the State. He is clothed with the presumption of innocence, and in cases of circumstantial evidence the State by its evidence must exclude every reasonable hypothesis except that of guilt. Had appellant been found with mud upon his clothing, or that he had changed his clothing, or that he had pulled off his shoes and gone barefooted, might have been circumstances of more or less weight of an incriminating nature. The State must meet and overcome the presumption of innocence to the exclusion of every reasonable hypothesis except guilt. Failure of facts to prove the State's case does not raise the presumption of guilt against the accused. Inferences and deductions from failure of proof are to be taken not against the accused but in his favor. The position of the State that the jury might presume against the accused in the absence of such facts is not a correct view of the law. The jury is not authorized to so presume. The rule is that the State must prove its case to the exclusion of every reasonable hypothesis except guilt, and where it fails to so prove incriminating facts it redounds to the benefit of the accused. There are a great many facts in this record that were not collated in the original opinion and will not be collated in this opinion. The record contains something like one hundred and eighty pages of testimony and deals very extensively in all character of details on direct as well as cross-examination of the witnesses. We are of opinion in writing originally and now that the case was sufficiently stated as to the incriminating facts. To undertake to state all the testimony in a voluminous record of facts as contained in this transcript would render the opinion uselessly long.

As stated in the original opinion, the question of motive is not always a criterion but that it adds to the strength of a case when proved as one of the circumstances, or it might detract from it with no motive proved. It is not a sine qua non in any event. The State's theory on the question of motive seems to be based upon the fact that appellant owed his mother-in-law something like eleven thousand dollars on a tract of land, and that he was afraid she would press him for payment in January, as the note then fell due. This is more of a theory, however, than a fact. We have looked over this record again to ascertain if there is any tangible reason to believe that appellant thought his mother-in-law was going to press the collection of that debt and we fail to so find. It is also urged that by the death of the mother-in-law his wife might secure her portion of her mother's estate. That is speculative, because there is nothing to show what disposition the deceased was going to make of the property, and at the time it was not known, so far as this record is concerned, what her purpose and intentions were. One or more of her sons had signed her name to checks without her authority, upon the discovery of which she protested and ordered the bank not to honor any more

checks unless she herself signed them.   The killing of the mother-in-law by appellant would not have cancelled the eleven thousand dollar debt.   She retained a vendor's lien on the land and was supposed to be sufficiently secured, and there is no evidence what part of the property his wife or any of the children of deceased would get.   We hardly think this is of any serious import.   Had she died without a will his wife would have, under the law, secured her proportionate share as a child, and there is no evidence that a will had been written changing the legal status of her rights.   This reason would apply to any of her brothers and sisters.

With reference to the testimony of Pena in regard to the trip taken by himself and appellant on the evening of the homicide, and especially as it relates to the hack and the gun and the contents of the hack, it may be stated that Pena made many statements to the effect that he did not see a gun in the hack, and that he never made a contrary statement showing there was one until he had been removed from the jail in Guadalupe County to the jail in San Marcos, Hays County, some two months or more after being placed in the Guadalupe County jail.   Upon the trial he testified that appellant got out of the hack at a point he designates and went to the middle of the hack and got a gun from the hack, stating that he was going to see a man who owed him something.   Pena assisted appellant in hitching the team to the hack before they left appellant's home, went with him to Martindale, where Pena bought a lot of groceries and put in the hack, among other things a sack of flour, some coffee and beans and possibly other groceries.   The witness Sanderson testified that he saw a box of groceries placed in the hack by the Mexican, Pena, but saw no sacks in the hack; that he did not see any gun in the hack.   He was asked if there might not have been a gun under the front seat.   To this he answered there could have been one but he did not see it; that a gun might have been placed under the seat of the hack by being taken to pieces but he did not observe one.   His language was this:   "I didn't see any shotgun.   I guess anybody could have put one under that seat if he had taken it to pieces.   I did not look under that seat."   He also states:   "I didn't see any sacks in there."   Pena testified that he bought a sack of flour, some beans, coffee and potatoes at Martindale.   He says:   "I did not see anything in front of the hack where our feet were except the points of the sacks and the rubber that was in there.   I did not see any gun in the hack then."   He also states:   "I did not see Mr. Wilkie barefooted any time that night.   I was sitting on the front seat of the hack and Mr. Wilkie got the gun from about the middle of the hack.   I saw that he went around to the middle of the hack and got the gun, but he did not move anything."   He also stated after his arrest, while at the Justice Court at Staples, "I told my wife that Mr. Wilkie had no shotgun in the hack that night."   Speaking also of an interview he had with the sheriff and deputy sheriff of Guadalupe County while in jail at Seguin he said:   "I did then and there tell them that Wilkie had no gun in the hack that night, and

I told them that Wilkie did not get out of the hack after he left the saloon and until we got to the river." It was between the saloon and the river where .the witness testified on the trial that Wilkie got out of the hack and got the gun from the middle of it. He also states: "I never at any time told anyone that Mr. Wilkie had a shotgun in the hack that night before I was taken to the San Marcos jail and had talked to the Mexican Santiago. I told Mr. Terrell that Mr. Wilkie had no gun in the hack that night and that Mr. Wilkie had never got out of the hack from the time he left the saloon until he got to the river." These are some quotations from Pena's testimony to show the divergence and difference between his statements prior to the trial and his evidence on the trial. These. quotations are taken from the record and to which.he testified on the trial.

We deem it unnecessary to go into a further detailed statement of these matters. We have reviewed this record again and are firmly convinced of the fact the opinion in the original hearing is correct. The burden is not on the,defendant to prove his innocence or to account for facts that can be proved by the State. This is not a question where facts are exclusively within the possession of the accused, and it is not one of those cases where deductions adverse to the defendant for not disclosing facts exclusively within his possession. The State must make its case, where the accused pleads not guilty, to the exclusion of the presumption of innocence and the reasonable doubt, and the burden never shifts to the defendant. These facts were not exclusively in his possession and within his knowledge, and if so he was not required to prove them. Practically all the witnesses who testified knew that it had been raining and that the country surrounding the scene of the homicide for some distance was black soil and very muddy. They knew that a man could not approach the residence where the deceased was killed without going through this black mud, for the residence itself was situated on this black soil. There is some evidence of the fact that the officers when they arrested appellant were apprised of this, because they examined his gun and found, they claim, some black mud on it. They knew of the muddy condition of the country. They arrested appellant that night and took him to the scene of the homicide. The next morning early, in investigating, found barefoot tracks approaching the house in one direction and leaving it in another. They said this was a large barefoot track. Appellant was a prisoner, as was the Mexican, and yet there is nothing to indicate that they examined his clothes or made any investigation as to whether he was the man who made those tracks or had his clothes soiled with the mud from the scene of the homicide. If appellant did this killing he had to walk a half mile or more in going from the hack to where the killing occurred and same distance on his return, and all through this black mud. Here the matter rested, and it will not do to hold that any inference of guilt should be drawn from the defendant's silence with reference to these matters. It was the business of the State

to make out its case to the exclusion of every reasonable hypothesis except guilt.

The motion for rehearing is overruled.

*Overruled.*

PRENDERGAST, JUDGE, dissenting.