**Perry Como DENBY, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 62561.**

Court of Criminal Appeals of Texas, Panel No. 3.

March 16, 1983.

Rehearing Denied July 20, 1983.

Josh Don Curnell, III, Houston, for appellant.

Doyle W. Neighbours, Dist. Atty., and Kim Fallwell, Asst. Dist. Atty., Angleton, Robert Huttash, State's Atty., and Alfred Walker, Asst. State's Atty., Austin, for the State.

Before W.C. DAVIS and TEAGUE, JJ., concur.

## OPINION

TEAGUE, Judge.

Perry Como Denby, appellant, was indicted for committing the offense of felony theft of the third degree. See V.T.C.A., Penal Code, Sec. 31.03. He was tried and convicted by a jury, which also assessed punishment at six years' confinement in the penitentiary. Because we find the evidence insufficient as a matter of law to sustain the conviction, we are compelled to reverse the conviction.

The indictment in this cause alleges in pertinent part that on or about December 27, 1977, appellant "did then and there with intent to deprive the owner, Jack Potter, of property, namely money, did unlawfully appropriate such property, without the effective consent of said owner, which property had a value of over Two Hundred and No/100 Dollars and less than Ten Thousand and No/100 ($10,000.00) Dollars." Jack Potter was a vice president of Angleton Bank of Commerce, which actually sustained the loss.

■ The State asserts that "This case involves a scheme where Appellant was accused of kiting checks between Angleton Bank of Commerce and other banks." By definitions we have found for the term "check kiting," as applied to this cause, we are not completely convinced that this is a check kiting case. Check kiting is a species of fraud or fraudulent practice consisting of the exchange of checks of approximately the same dates and amounts between two banks for the purpose of obtaining money. *Baskerville v. State,* 23 Md.App. 439, 327 A.2d 918 (Md.App.1974). To put it another way: it is a process where checks written on one account are continually covered with deposits of checks written on another account thereby creating positive statement balances and preventing overdrafts but resulting in a steadily decreasing deficit in the collective balance in most of the accounts. *North Carolina National Bank v. South Carolina National Bank,* 449 F.Supp. 616, 617 (D.C.S.C.1976). Also see *First State Bank & Trust Company of Edinburg v. George,* 519 S.W.2d 198, 204 (Tex.Civ. App. Corpus Christi 1974, Writ Ref'd n.r.e.).

Potter, testifying in the capacity of a custodian of the records of Angleton Bank of Commerce, testified that *records* of the bank reflected that on December 27, 1977, a personal checking account in the name of appellant was opened with Angleton Bank of Commerce, "probably by mail." A third party check with the signature of a person who was not authorized to sign the check was used in opening the account. Texas Commerce Bank in Houston, on which the

check issued, subsequently made it good for reasons not clearly stated in the record of appeal. *Records* of Angleton Bank of Commerce also reflect that in a relatively short period of time several checks totaling $2,606.81 were posted to the checking account. The *records* of the bank also reflect that most of the posted checks turned out to be uncollectible or were checks written on other bank accounts which had been closed prior to the issuance of the checks or were in fact checks drawn on accounts that did not exist. Apparently, only two checks that were posted to the checking account subsequently cleared by being paid by the bank on which they were drawn. *Records* of the Angleton bank also reflect that 10 checks, totaling $2,411.36, were written against the account. Without discussing the details of the transactions involving the checking account, suffice it to say that the bank sustained a total loss of $2,606.17. *Records* of the bank also reflect that a savings account was opened in the name of the appellant. A check drawn on First National Bank in Huntsville was used in opening that account. *Records* of the Angleton bank reflect that the account at the Huntsville bank had been closed prior to the issuance of the check. *Records* of the Angleton bank also reflect that other than the savings account being opened, with a bad check being used in opening the account, no further activity regarding this account took place.

■ It is axiomatic that hearsay evidence has no probative value. *Salas v. State,* 403 S.W.2d 440, 441 (Tex.Cr.App. 1966). However, one exception to the hearsay rule of evidence is that information contained on a business record maintained and kept in the regular course of the business may be introduced into evidence, after the proper predicate has been satisfied, even though to the testifying witness the business record and its contents are hearsay. Art. 3737e, V.A.C.S. Also see Ray, *Texas Practice,* Sec. 1257, footnote 74; *McCormick on Evidence,* Section 307 (1972 Edition); Binder, *The Hearsay Handbook,* Exception 8. Thus, in this instance, records of the Angleton bank, though hearsay to

Potter, were admissible pursuant to Art. 3737e, supra, to establish whatever happened to the checks that were posted to the checking account, either in the form of a deposit to or a withdrawal from the account. The records of the Angleton bank which pertained to the checking and savings accounts were therefore admissible for the truth of the matter of the items contained in the records. However, it would be multiple hearsay for a custodian such as Potter to express any opinion as to the truth of the matter of what may have existed at a second banking institution. For example, State's Exhibit Number 6 is a check drawn on The Citizens Bank of Philadelphia, Mississippi, in the amount of $189.50, payable to Angleton Bank of Commerce. As to any notations that may have been placed on the check by employees of the bank in Angleton in the regular course of business, when the check was processed through that bank either initially or after it was returned to the bank by the bank in Mississippi, the custodian of the Angleton bank's records could testify to whatever the notations on the checks meant. It was thus permissible for Potter to testify that the check was returned unpaid to the Angleton bank. However, it was not permissible for Potter to testify as to the truthfulness of the records of the account at the bank in Mississippi because he had no personal knowledge of the business of that bank, nor was it shown that he was a custodian of the Mississippi bank's records.

Other evidence adduced showed that appellant and Potter first met one another at some time on a late Friday afternoon in January, 1978, when appellant attempted to purchase money orders and cashier checks at a drive-in bank window of the Angleton Bank. Potter had gone to that location after he was summoned by a teller. Potter advised appellant to return to the bank on Monday because such a purchase had to be made inside the bank and that part of the bank was then closed. Appellant told Potter or the drive-in teller that he had an account at the bank, which, of course, by the bank's own records was true. Whether

appellant returned to the bank on the following Monday is not reflected by the record of appeal.

Angleton police officer Daniel Beaver testified that on January 3, 1978, at 5:19 a.m., he had occasion to come into contact with appellant outside the bank on the bank's parking lot. Appellant told Beaver he was then in the process of making a night deposit of a check but did not have an envelope in which to put the check in order to make a deposit at that time. The evidence does not reflect whether or not appellant actually made a deposit. Our reading of Potter's testimony and examination of the exhibits that were introduced into evidence does not reveal where a deposit of any kind was posted to the checking account on January 3, 1978.

Andy De Sham, a handwriting expert, testified he made a comparison of a known handwriting exemplar of appellant with exhibits introduced into evidence by the State, and in his opinion some of the exhibits were made by appellant. However, this testimony is somewhat weakened by the provisions of Art. 38.27, V.A.C.C.P., which provides as follows: "It is competent to give evidence of handwriting by comparison, made by experts or by the jury. *Proof by comparison only shall not be sufficient to establish the handwriting of a witness who denies his signature under oath.*" (Emphasis Added). In this cause, appellant expressly denied that he had signed any of the checks that were posted to the checking account, either in the form of a credit or a debit to the account. He further denied that he had signed or endorsed any of the checks, and further denied using a signature stamp for those purposes. Appellant did not deny, but in fact admitted he had accounts at the Angleton bank. He also admitted that he had "twenty (or) twenty-one ... of them signature stamps." Thus, if all that was before this Court was the testimony of Potter, the State's exhibits, and De Sham's testimony, the evidence would clearly be insufficient. In addition to Art. 38.27, supra, also see *Turner v. State,* 636 S.W.2d 189, 194 (Tex.Cr.App. 1982) (Roberts, J. On State's Motion for Rehearing), and footnote 3 of the opinion; *Ex parte Watson,* 606 S.W.2d 902, 905 (Tex. Cr.App.1980); *Cadd v. State,* 587 S.W.2d 736, 740 (Tex.Cr.App.1979) (Opinion on State's Motion for Rehearing); and *Herndon v. State,* 543 S.W.2d 109, 118–119 (Tex. Cr.App.1976). The only remaining significant testimony and evidence that the State presented concerned the appellant's arrest.

Tony Mostia, at the time an Angleton police officer, testified that on January 25, 1978, he arrested appellant in Houston pursuant to an arrest warrant. Appellant was then sitting at a desk inside a building, which was apparently owned by appellant's father. Next to the desk was a briefcase. Found on top of and inside the desk were numerous signature stamps, which the police seized. A "For Deposit Only" rubber stamp was also seized. Numerous other rubber stamps were found, but these referred to several business enterprises appellant testified he owned or managed. A bankbook which related to the checking account at Angleton Bank of Commerce, and which contained deposit slips and checks, was seized from the briefcase. A savings passbook which related to the savings account at Angleton Bank of Commerce was also seized from the briefcase. The signature that was on the stamps that were seized was similar in appearance to signatures that were stamped on some of the checks processed through Angleton Bank of Commerce. Blank checks on the bank in Huntsville, which was the bank on which a check was written to open the savings account, were also seized from the briefcase. A bank statement for the checking account at Angleton Bank of Commerce was also found in the briefcase. Other than establishing that appellant was sitting at the desk and was near the briefcase, the State presented no evidence to establish that appellant exercised any control over or had the care, custody, and control of the items of property that were seized by the police. Nevertheless, do the items of evidence that were seized pursuant to appellant's arrest supply the necessary link to connect the appellant to the check-

ing account and the activity it generated which resulted in Angleton Bank of Commerce suffering a financial loss?

The State did not call any person or custodian of any of the records of the second banks. Thus, whatever relationship appellant may have had with those banking institutions is not known by any admissible evidence. Nor is the truthfulness of those banks' records known. Nor did the State have any persons testify, or account for their absence, who might have shed light on the third party checks posted to the checking account, and appellant's relationship or non-relationship to the third party checks. By the State's evidence, appellant was never shown to have been inside of the Angleton bank. Other than the one instance at the drive-in bank window, appellant was never directly shown to have conducted or attempted to have conducted any business at the bank. As to the other time when appellant was shown to be outside the bank on the bank's parking lot, it is unknown whether appellant actually transacted any business at the bank after Beaver left him. The items of evidence that were seized from the desk and briefcase where appellant was arrested comported in all things with the State's evidence that the appellant had accounts at Angleton Bank of Commerce. The items of evidence seized at the scene of appellant's arrest do little to assist us in that, standing alone, they represent nothing less than what a business person might normally have in, on, or about his desk regarding a bank account that he then had.

It is obvious from the above summary that this is a case dependent upon circumstantial evidence. The trial judge so instructed the jury. Cf. *Hankins v. State,* 646 S.W.2d 191 (Tex.Cr.App.1983). The jury was instructed in part that before it could find appellant guilty, it had to find that each fact necessary to the conclusion sought to be established must be proved by competent evidence beyond a reasonable doubt. It was also instructed that before it could find the appellant guilty it had to find that all the facts, that is, the facts necessary to the conclusion sought, must be con-

sistent with each other and with the main fact sought to be proved, and the circumstances, taken together, must be producing, in effect, a reasonable and moral certainty that the appellant, and no other person, committed the offense charged.

■ Although we are not left without suspicion that appellant was more than an innocent party to the activities of the checking account at the Angleton bank, as well as the other banks, and the third party checks, we are unable to state that the verdict of the jury is proper in light of the above instruction the trial judge gave the jury. It is fundamental law that proof amounting only to a strong suspicion or mere probability to connect the defendant to the charged crime is not sufficient to sustain a verdict. *Autry v. State,* 626 S.W.2d 758, 761 (Tex.Cr.App.1982); *Schershel v. State,* 575 S.W.2d 548, 550 (Tex.Cr.App.1979); *Bryant v. State,* 574 S.W.2d 109, 111 (Tex.Cr.App.1978).

■ Although the State established that bank accounts were opened at the bank in Angleton in the name of appellant, proved that the account had activity, established that most of the checks posted to the account were deficient in one way or another, proved that most of the checks written on other bank accounts were also deficient in one way or another, nevertheless, it failed to prove that the appellant knowingly appropriated the bank's money. There is simply no evidence shown to connect the appellant with knowingly participating either individually or jointly in any fraudulent scheme to defraud the bank of its money. Outside of the records of the bank, we are left with nothing with which to link appellant to any wrongful activity concerning the bank. The State established he had two accounts at the bank. The items of evidence seized pursuant to his arrest related to those accounts. His presence outside of the bank on two different occasions, standing alone, means absolutely nothing. We have carefully searched this record but have been unable to find where appellant ever had any direct or indirect knowledge

that when checks were deposited to or written on the checking account he knew those checks were in some manner deficient or defective. The bank statement the police seized pursuant to appellant's arrest reflects that as of January 4, 1978, appellant's checking account had a positive side of $1,202.66; that a total of $1,374 in checks had been paid by Angleton Bank of Commerce; that a total of $2,576.86 deposits had been made; that a total of four checks had been paid; and that a total of five deposits had been made.

Perhaps if the State had presented testimony from persons affiliated with the other banks, and the banks and individuals involved in the third party checks, or established that those persons did not exist, the State's case would be more favorably received. However, after carefully examining the record of appeal, we are unable to conclude that the evidence is sufficient to sustain the conviction, and must therefore reverse the conviction.

■ Because of our finding that the evidence is insufficient to sustain the verdict of the jury, and because of *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); also see *Greene v. Massey,* 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978), we must not only reverse the conviction, but must direct the trial court to enter a judgment of acquittal.

W.C. DAVIS, J., concurs in the result. Before the court en banc.

### OPINION ON STATE'S MOTIONS FOR REHEARING

CLINTON, Judge.

Leave to file motion for rehearing was granted the State in these causes and they were consolidated in order for us to determine whether the "standard for appellate review" is the same for circumstantial evidence cases and direct evidence cases.

■ The question of sufficiency of evidence to sustain a state criminal conviction implicates the Fourteenth Amendment. *Jackson v. Virginia,* 443 U.S. 307, 319 n. 12,

99 S.Ct. 2781, 2789 n. 12, 61 L.Ed.2d 560 (1979), "announced ... the constitutional minimum required to enforce the due process right" to be free from conviction except on proof beyond a reasonable doubt. The Court then reasoned:

"[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.' *Woodby v. INS,* 385 U.S. [276,] at 282 [, 87 S.Ct. 483, at 486, 17 L.Ed.2d 362]. Instead, *the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.* See *Johnson v. Louisiana,* 406 U.S. [356,] at 362 [, 92 S.Ct. 1620, at 1624, 32 L.Ed.2d 152]. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution. The criterion thus impinges upon 'jury' discretion only to the extent necessary to guarantee the fundamental protection of due process of law. [Footnotes omitted and emphasis added.]"

443 U.S. at 318–319, 99 S.Ct. at 2788–2789.

Although *Jackson* was setting a standard for review of state convictions by federal courts, the due process requirements that it announced were based expressly on the Fourteenth Amendment. They are binding on the states and constitute a minimum standard for our sustaining a conviction.

"Under [*In re*] *Winship,* [397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970),] which established proof beyond a reasonable doubt as an essential of Fourteenth Amendment due process, it follows that when such a conviction [that was obtained even when no rational trier of fact could have found guilt beyond a reasonable doubt] occurs in a state trial, it cannot constitutionally stand." 443 U.S. at 317–318, 99 S.Ct. at 2788. "[S]tate appellate review undoubtedly will serve in the vast majority of cases to vindicate the due process protection that follows from *Winship.* . . ." 443 U.S. at 322, 99 S.Ct. at 2790.

█ It follows that circumstantial evidence should not be tested by an *ultimate* "standard for review" different from direct evidence; the standard in both kinds of cases is whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Accord *Griffin v. State,* 614 S.W.2d 155 (Tex. Cr.App.1981).

█ Still, we are unable to devise or discover any reason, compelling or otherwise, for abandoning the utilitarian "exclusion of outstanding reasonable hypotheses" analysis for *applying* the above "standard for review" in circumstantial evidence cases. By the nature of circumstantial evidence, in order to determine it rationally establishes guilt beyond a reasonable doubt, a process of elimination must be used. Illustrative is *Taylor v. State,* 653 S.W.2d 295 (Tex.Cr.App.1983). We there cited the *Jackson* "standard for review;" in actually assessing the evidence, no method *other*

than a process of eliminating the guilt of others under the evidence could be fashioned to effectively conclude the evidence rationally established Taylor's guilt beyond a reasonable doubt. See also *Girard v. State,* 631 S.W.2d 162 (Tex.Cr.App.1982). Stated in the converse, if the evidence supports an inference other than the guilt of the appellant, a finding of guilt beyond a reasonable doubt is not a rational finding.

Moreover, scrutiny of the analysis suggested in the motions for rehearing (that the focus of our inquiry should be on "any evidence which could rationally support the verdict") reveals it to be functionally indistinguishable from that specifically rejected by the Supreme Court in *Jackson,* supra, as violative of the Fourteenth Amendment.

█ Finally, as the motions for rehearing persuasively argue, this Court's opinions have never held the circumstantial evidence *analysis* constitutes a different *standard for review* from that to be ultimately applied in direct evidence cases.* If the State's evidence supports an inference other than a finding of the essential elements of the crime, then no trier of fact could *rationally* find the accused guilty *beyond a reasonable doubt*—and this is true irrespective of the character of the evidence.

In sum, we are convinced there are no better analytical guidelines for assaying whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt in any given conviction had upon circumstantial evidence than those we currently employ.

---

* It is true that some opinions of the Court have quoted language apparently originating from the pen of an author or editor of *Texas Jurisprudence* to the effect that in circumstantial evidence cases an appellate court will "review the evidence in light of the *presumption that the accused is innocent,*" 18 Tex.Jur. § 309, p. 432.

  Literally and technically inaccurate, the statement is revealed as a writer's attempt to convey the notion that the State's burden of adducing proof beyond a reasonable doubt is but a conceptual corollary of the presumption of innocence, and a failure to produce that evidentiary quantum operates to absolve the appellant. [See *Hill v. State,* 118 Tex.Cr.R. 73,

38 S.W.2d 787 (Tex.Cr.App.1931); *Castro v. State,* 115 Tex.Cr.R. 291, 29 S.W.2d 760 (Tex. Cr.App.1930); *Jones v. State,* 111 Tex.Cr.R. 172, 11 S.W.2d 798 (Tex.Cr.App.1928) (Opinion on State's Second Motion for Rehearing); *Jackson v. State,* 101 Tex.Cr.R. 169, 274 S.W. 585 (Tex.Cr.App.1925); *Mathis v. State,* 100 Tex. Cr.R. 509, 272 S.W. 204 (Tex.Cr.App.1925); *Fitts v. State,* 98 Tex.Cr.R. 146, 264 S.W. 1006 (Tex.Cr.App.1924); *Wales v. State,* 86 Tex. Cr.R. 183, 217 S.W. 384 (Tex.Cr.App.1919); *Wilkie v. State,* 83 Tex.Cr.R. 490, 203 S.W. 1091 (Tex.Cr.App.1918); *Hampton v. State,* 1 Tex.Ct.App. 652 (1877), which are cited for the mentioned inaccurate proposition at 24 Tex. Jur.2d, § 742, p. 425, n. 13 (1961).]

The State's motions for rehearing are overruled.

ONION, P.J., concurs in result.

MILLER and CAMPBELL, JJ., not participating.

McCORMICK, Judge, concurring.

I agree that the standard for review in any case is *whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.* I write to emphasize that application of the "exclusion of outstanding reasonable hypotheses" analysis is, as stated by the majority, one criteria which may be applied in arriving at the answer to the ultimate result, but it should not be considered an element of that ultimate standard. And as the majority emphasizes, the method of analysis does not change this standard of review.

Logic dictates that if there is a "reasonable hypotheses" other than the guilt of the accused, then it cannot be said that the guilt has been shown "beyond a reasonable doubt." In *Hankins v. State,* 646 S.W.2d 191 (Tex.Cr.App.1983), we recognized that direct and circumstantial evidence were to be treated with equal dignity. Thus, any effort to weave into the standard of appellate review any exception or difference or special treatment for one type of evidence or the other will fail for lack of logic.

Lastly, in applying this standard to the cases before us, the final outcome is the same. Therefore, I concur in the overruling of the States' motions for rehearing in each case.

TOM G. DAVIS, W.C. DAVIS and TEAGUE, JJ., join in this concurrence.