Lawrence CROOKS, Appellant,

v.

The STATE of Texas, Appellee.

No. 04–81–00312–CR.

Court of Appeals of Texas,
San Antonio.

Sept. 12, 1984.

**769**

Before CADENA, C.J., and ESQUIVEL, BUTTS, CANTU, REEVES, TIJERINA and DIAL, JJ.

## ON STATE'S MOTION FOR REHEARING EN BANC

CADENA, Chief Justice.

The State's motion for rehearing is granted. Our previous opinion is withdrawn and the following is substituted therefor.

A jury found appellant, Lawrence Crooks, guilty of burglary of a building and the trial court sentenced him to 15 years' imprisonment.

Appellant's sole contention is that the evidence is insufficient to support the conviction.

The fact that the State relies solely on circumstantial evidence is irrelevant insofar as the standard for evaluation of the evidence is concerned. The appellate court will, whether the evidence is direct or circumstantial, review the evidence in the light most favorable to the verdict or judgment. *Houston v. State,* 663 S.W.2d 455, 456 (Tex.Crim.App.1984); *Wilson v. State,* 654 S.W.2d 465, 467 (Tex.Crim.App.1983). While it is true that in circumstantial evidence cases our courts have often said that such evidence is not sufficient to support a conviction unless it excludes every reasonable hypotheses except that of defendant's guilt, it is clear that the application of that formula cannot be restricted to circumstantial evidence cases. No one would seriously argue that direct evidence can be held sufficient to support a conviction unless it is sufficient to exclude all reasonable hypotheses except that of defendant's guilt. Unless, for example, direct evidence is sufficient to exclude the hypothesis that some person other than the defendant committed the offense, the evidence necessarily falls short of establishing the guilt of defendant beyond a reasonable doubt. Whether the evidence be direct or circumstantial, the standard, as pointed out in *Wilson, supra,* is whether any rational trier of fact could

Juan Aguilera, San Antonio, for appellant.

Bill White, Dist. Atty., Raymond Angelini, Jerry Rosson, Asst. Criminal Dist. Attys., San Antonio, for appellee.

have found that defendant was guilty beyond a reasonable doubt. 654 S.W.2d at 471.

■ The burglary in question, during which a safe was removed from the building, took place in San Antonio, according to the indictment, on or about April 7, 1980. It was discovered during the early morning hours of that day, which was the Monday following Easter Sunday. The burglary occurred between 5:00 P.M. Friday, April 4, and the time it was discovered early Monday, April 7. There is no evidence tending to establish the identity of the burglar or burglars, and San Antonio police officers were unable to lift any fingerprints at the scene. The safe in question was recovered in Houston the following day, Tuesday, April 8, 1980, at about 4:30 A.M. The evidence is clearly sufficient to establish that the burglary occurred and that the safe found in Houston was the safe taken during the burglary. The sole question concerns the sufficiency of the evidence to support, beyond a reasonable doubt, the guilt of appellant.

### THE STATE'S EVIDENCE

At about 4:30 A.M. Tuesday, April 8, Officer Quintano, of the Houston Police Department, was on routine patrol, driving south on Jensen Avenue. As he came to the intersection of Jensen and Foote Street, he saw a "bobtail" Ryder truck parked on Foote Street. He decided to investigate because some stolen Ryder trucks had been found abandoned in the area. There are no street lights on Foote, and the truck was parked in a bushy area.

Quintano turned into Foote Street, with the headlights and spot light on his patrol car turned on. He saw a safe on the ground behind the truck and saw appellant standing directly at the side of the safe. Appellant began to walk away from the safe, disregarding the officer's instruction to stop. The officer left the car and caught up with appellant and grasped him by the arm. Appellant said he was waiting for a bus. Quintano pointed out that buses stopped running at 2:00 A.M. and that no

buses ran on Foote Street. Appellant then said, "I had nothing to do with it." When the officer asked what appellant was "talking about" appellant did not answer and made no further statements to Officer Quintano. The officer then placed appellant in the back seat of the patrol car. As he was doing so, he saw a man emerge from the cab of the truck and crawl under the truck. He apprehended this person and placed him in the back seat of the patrol car.

At the time the officer approached appellant he noticed that appellant was sweating freely and that appellant's clothing was muddy and had white "powdery insulation type material" on it.

After Quintano had placed the second man in the patrol car he walked to the truck and safe and noted that the bottom of the safe had been "broken out." The back doors of the truck were open and, in the rear of the truck, Quintano found the bottom of the safe, a chain, tools and "debris."

Photographs admitted in evidence show that the entire bottom of the safe had been removed. Photographs of the rear of the truck show the bottom of the safe, a tennis shoe, a chain, and debris and tools, including what appears to be a small pick-axe.

According to the State's evidence, there are no bus stops closer than two blocks from the intersection of Jensen and Foote. The truck was parked in a muddy area about 100 feet from the intersection and appeared to be stuck in the mud.

Officer Gold, who arrived with other officers at the scene at about 4:45 A.M. in response to Quintano's radio report concerning his location and activity, saw the safe on the ground and noted that its bottom had been "opened." He also saw the safe bottom and the tools in the rear of the truck.

Appellant was taken to the police station and then to the police laboratory where Workington, a police toxicologist and chemist, asked him to remove his clothes. An examination of appellant's clothes and body

was made by Workington who found, on appellant's jeans, chips of paint, pieces of mica and pieces of metal, including a brass-colored spherical object which Workington described as being similar to a "welder's slag."

The paint found on appellant's jeans matched samples of paint which Workington obtained from the back of the truck and the bottom of the safe where entry had been made.

Workington testified that the amount of "debris found on appellant's clothing, particularly the debris found in the pocket of appellant's jeans could not result from appellant's merely touching or pushing the safe." He said that in his professional opinion based on his scientific training, in order for so much debris to find its way to appellant's clothing, it would have been necessary for appellant to have been working on the bottom of the safe at the point at which entry had been made.

Similar, but significantly less, debris was found on the clothing of the other person who had been apprehended after he jumped out of the cab of the truck and crawled under the truck.

TESTIMONY FOR THE DEFENSE

Appellant, his wife, his mother and an aunt all testified that the four of them had had Easter dinner at about 10:30 A.M. in Houston at the home of appellant's mother, with whom appellant and his wife lived. Appellant and his wife then drove the aunt to the home of a niece in appellant's car. Appellant's wife testified that she and appellant were together all day on Easter Sunday, April 6, 1980. After dropping off the aunt, she and appellant visited various relatives and returned home at about 6:00 P.M. She testified that appellant was with her about half the day on the preceding Saturday, April 5, but she did not know where he had been the remainder of that day, although she knew he had been in Houston all day Friday, April 4. She said that on Monday, April 7th appellant left the house for part of the day. When he returned he told her about a possible job at Proler Steel Company as a security guard. He left home again at about 11:30 that night, telling her he was going to see about the job and would not be gone long. He rode the bus instead of taking the car because she had a doctor's appointment the following morning. They had experienced no trouble with the car while they were driving around Houston the preceding day.

Appellant's mother testified that appellant and his wife had returned home at about 11:00 P.M. Sunday, April 6. Appellant and his wife did not get up until around noon Monday, April 7, and they stayed home all day.

According to appellant's mother, after appellant and his wife returned home on Easter Sunday, they went out in the yard to hide eggs. After a while, they went into the house and, after eating, went back into the yard to hide more eggs and then went back into the house. According to the mother, appellant's car was not available because it was "broken down," and when he told her on Monday that he was going to see about a job, she told him to wait until Tuesday because he could not use his car. She testified that, despite her advice, he left at about 5:00 A.M. Monday morning to go to see about the job. She testified that appellant remained at home all day Monday and Monday night.

Appellant testified that he left home at about noon on Monday, April 7, and went to the employment office. He returned home at about 6:00 P.M. and remained at home until 11:30 P.M. that night, at which time he left to go to Proler Steel Company to see about the job as security guard. He caught a bus which took him to Lyons Street, about seven blocks from the steel company. He offered no explanation concerning his decision to take the bus rather than using his car at this hour.

Appellant testified that he left the bus on Lyons at about 2:00 A.M. Tuesday, April 8. He then called the steel company to see if Prescott, the man he was supposed to see about the job, was there. Prescott was supposed to come on duty at midnight, but

he did not call to see if Prescott was, in fact, on duty, until he had ridden the bus and alighted from the bus at 2:00 A.M. He was told that Prescott had called in to report that he would be late and had not yet arrived at his station at 2:00 A.M., but that he was on the way.

Appellant's testimony concerning time is not altogether consistent. Depending on the portions of his testimony which are considered, he arrived at the steel company at about 1:30 or 2:00 A.M. or as late as 3:00 or 3:10 A.M. After he left the bus at Lyons Street, it took him about 35 or 40 minutes to walk to the steel company.

Prescott arrived at the steel company about 30 minutes after appellant got there. According to different portions of appellant's testimony, Prescott reported for work at 2:00 A.M., 2:30 A.M., 2:45 A.M., 3:00 A.M. or 3:30 A.M.

The job concerning which appellant had talked to Prescott previously required him to work from midnight until 7:00 A.M. Appellant told Prescott that, while he was willing to take that job, he preferred to work during the day so that he could be home with his family at night. Prescott then mentioned the possibility of a job on the shift which began at 8:00 A.M. and suggested that appellant return at 8:00 A.M. to talk to the person in charge of that shift. Appellant testified that, although he had gone to the plant already to begin work immediately, he decided to wait until he explored the possibility of the daytime job, and told Prescott that he would be back at 8:00 A.M.

One of the workers at the plant refused to give appellant a ride to the home of appellant's brother. A man who had just finished unloading his truck at the steel plant at first seemed reluctant to give appellant a ride, but after being assured by Prescott that appellant would not attempt to rob him finally agreed.

Appellant left Proler Steel at 3:30 A.M. and alighted from the truck at the intersection of Lyons and Jensen. According to portions of his testimony, he arrived at that intersection at about 4:00 A.M.

Appellant said he walked to a nearby cafe where he drank a soft drink and watched some men shooting dice in a back room. Although he considered taking part in the dice game, he eventually decided against it and left the cafe.

Appellant then walked to a doughnut shop about seven blocks from the cafe and bought six doughnuts. He then started walking back to the cafe, but when he saw a bus which was headed in the wrong direction he decided to wait for a bus on Jensen, about four blocks from the doughnut shop. He testified he waited at a bus stop at the intersection of Foote and Jensen.

According to appellant, after he had been waiting at the bus stop about five minutes, a man approached him and asked appellant to help push a truck which was stuck in the mud on Foote Street. The man was on foot and had walked on Foote Street to Jensen. Appellant accompanied this man down Foote to a point where a truck was standing off the road in a bushy area. Apparently, there were two other men, in addition to the one who had asked appellant to help, trying to push the truck. Appellant told them he would help but that if a bus came by he would have to leave to catch the bus.

One of the other men got in the cab, and appellant and another pushed on the back of the truck. The third man was attempting to help by pushing against the back of the truck with a car, using the front end of the car to push. Appellant suggested that the car be turned around and that it be backed up against the back of the truck so that the wheels of the car would not be in the mud.

The safe, which appellant did not immediately recognize as a safe, was on the ground in back of the truck and was attached to the rear of the truck by a chain. After some further attempts to push the truck out of the mud had failed, appellant put his hand on the safe and attempted to push it. He unhooked the chain from the truck and dropped it on the ground. He

did not remove the chain from the safe. They then succeeded in pushing the truck back on the road and appellant left the scene and walked back to the bus stop.

Appellant testified that while he was at the bus stop, he saw a patrol car approaching. As the police car approached the intersection of Jensen and Foote, a black car with its lights out emerged from Foote Street onto Jensen, passing the police car but going in the opposite direction. The patrol car turned into Foote Street, backed out to turn around and, according to appellant, "was taking out after: the black car, but when the officer saw appellant at the bus stop the police car came to a halt and the officer asked, "What's going on?" Appellant asked, "What do you mean?" The officer asked no questions about the car which had emerged from Foote Street.

Appellant told the officer that he had helped "those guys" push a truck out of the mud and added, "There is one dude on the corner ... There is another one running across the street." According to appellant, the officer called for additional officers and asked that they go after the black car. The officer then asked appellant to get in the patrol car. As of this time, according to appellant, the officer had not seen the truck or safe on Foote Street because of the many trees and bushes. The officer was lying when he said that he saw the truck from Jensen because it was impossible to see the truck from Jensen. At the time the officer began to talk to appellant, appellant was on Jensen and was "nowhere near" the truck or safe.

After appellant got in the patrol car, the officer backed the patrol car up in order to turn into Foote Street. The officer drove up to the truck with his headlights on and saw the man who was hiding under the truck. By this time, the other officers had arrived on the scene.

Appellant's alibi is corroborated by the testimony of his wife and mother only insofar as his presence in Houston during the night of April 6–7. The evidence established that the burglarized building housed a business which was closed, with no one on the premises, from 5:00 P.M. Friday, April 4, until 8:00 A.M. Monday, April 7. The burglary, which was discovered Monday morning, could have occurred Friday night or at any time Saturday. The testimony of appellant's wife and mother, even if believed, despite the obvious discrepancies between the testimony of the mother, on the one hand, and that of appellant and his wife, on the other, and the inconsistencies in the mother's statement, does no more than place appellant in Houston during the night of April 6–7.

It is clear that the jury did not believe appellant's version of his activities from the time he left his home Monday night and the time he was found on Foote Street by the officer at 4:30 A.M. Tuesday morning. Appellant's narrative invites disbelief. He gave no reason for deciding to take the bus at 11:30 P.M. to make the 2-hour journey to Lyons Street instead of taking his car. His wife explained that she had a doctor's appointment Tuesday morning and assigned that as the reason for the decision to take the bus, although he assured her that he would be back shortly. The nocturnal odyssey was undertaken without an attempt to confirm that Prescott, the man he was supposed to talk to about the job, would be at the steel plant. It wasn't until appellant had concluded the long bus trip that he thought it prudent to make an effort to determine if Prescott was at the plant. According to appellant, there was no particular reason prompting his decision to see about the job Monday night. Prescott had mentioned the opening to appellant some days before, and appellant could have gone to the plant at any time before Monday night but chose not to do so.

Insofar as the time element is concerned, appellant's narrative concerning his activities after he left home presents some problems. However, he testified that the truck driver who gave him a ride from the steel plant dropped him off at the corner of Lyons and Jensen at about 4:10 A.M. He then went to a nearby cafe where he stayed for 5 or 10 minutes. It took him about 15 minutes to walk seven blocks to

the doughnut shop. He then began walking back to the cafe, but when he saw a bus he decided to go home and walked to a bus stop. This would mean that he arrived at the bus stop no earlier than 4:30 A.M. He was asked to help push a truck at 4:35 A.M. He then walked to the place where the truck was stuck in the mud on Foote Street. After several attempts had been made to push the truck, after his suggestion that the man using the car to push the truck turn the car around and back up to the rear of the truck, after other attempts to dislodge the truck from the mire had failed, although his suggestion had been followed, after he had unhooked the safe from the truck by removing the chain by which the safe was attached to the truck, and after the truck was finally dislodged from the mire, he returned to the bus stop. This would put him back at the bus stop no earlier than 5:00 A.M.

Officer Quintano testified that he saw the truck at 4:30 A.M. At this time, according to appellant's story, appellant was still at the doughnut shop. Officer Gold arrived on the scene at about 4:45 A.M. At this time, according to appellant's story, he and the other three or four men were still attempting to get the truck out of the field and back on the muddy street.

There is clearly sufficient evidence to justify the reasonable inference that things did not happen as appellant described the sequence of events. If the jury believed the testimony of the officers, appellant's story was clearly untrue, since his version of the facts would have him waiting for a bus at a non-existent bus stop. Appellant's version of the facts is completely at variance with the testimony of Officer Quintano concerning the circumstances under which the officer came upon appellant.

If the jury believed the testimony presented by the State, it could reasonably conclude that such evidence excluded every reasonable hypothesis other than that of appellant's guilt or, stated differently, that it established guilt beyond a reasonable doubt. Appellant attempted to leave the scene when he became aware of the presence of the police officer. His statement that he had had "nothing to do with it," which was not in response to any query, is inconsistent with the absence of guilty knowledge. Workington's testimony concerning the debris found on appellant's clothing, and his testimony that the amount present on the clothing was consistent only with circumstances involving work by appellant near the portion of the safe where the bottom had been removed, is sufficient to establish that appellant had done more than merely "touch" or "push" the safe. In short, the evidence is sufficient to establish that appellant was exercising control over the safe and was actively involved in an attempt to gain entry into the safe. Stated differently, the evidence is sufficient to establish, beyond a reasonable doubt, that appellant was in possession of, and exercising control over, recently stolen property which had been taken during the course of the burglary of the building in San Antonio. Such evidence is sufficient to support the conviction.

The judgment of the trial court is affirmed.

TIJERINA, Justice, dissenting.

I respectfully dissent.

In the case at bar there was no direct evidence connecting appellant to the offense charged; he was convicted on circumstantial evidence showing his presence at or near the location of the stolen safe and the particles of paint found on his clothing. The Texas rule provides that a conviction based on circumstantial evidence cannot be sustained if the circumstances do not exclude every other reasonable hypothesis except that of the guilt of the defendant. *Moore v. State*, 640 S.W.2d 300, 302 (Tex. Crim.App.1982). Proof amounting only to a strong suspicion or mere probability is insufficient. *Flanagan v. State*, 620 S.W.2d 591, 593 (Tex.Crim.App.1981). Mere presence at the scene of the crime alone is not sufficient to conclude beyond a reasonable doubt that the accused committed the offense. *Wright v. State*, 603 S.W.2d 838, 840–41 (Tex.Crim.App.1980).

Appellant's version of the facts is that he was at home all day on Monday, April 7, 1980, except for one hour when he went to the Texas Employment Commission. He testified that he left home at 11:00 p.m. to pursue an offer of employment from Sergeant Cecil Prescott, chief security guard for Proler Steel Company, who worked from 12:00 midnight to 7:00 a.m. After the job interview, he stopped briefly at an all night cafe and at a doughnut shop and proceeded to a bus stop. While waiting at the bus stop, a man asked for assistance in pushing a truck stuck on a muddy side street. Appellant removed a chain from the safe and assisted in pushing the truck to hard, grassy ground. Appellant stated he was standing at a bus stop about forty feet from the truck when the police officer arrived and arrested him.

### UNCONTRADICTED EVIDENCE

Appellant's uncontradicted testimony was that he had never before been in San Antonio and that he was in the general area where the truck was found for a job interview. Further, appellant's contention that he was at the scene to help push a truck that was stuck in the mud was corroborated by the police officer who noticed the muddy area and particularly mud and debris on appellant's clothing. The evidence concerning the particles of paint found on appellant's clothing is not that persuasive since he admitted handling and pushing both the truck and safe.

The role of the appellate court is not to inquire whether it believed the evidence at trial established guilt beyond a reasonable doubt; it is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Griffin v. State*, 614 S.W.2d 155, 159 (Tex.Crim. App.1981). In circumstantial evidence cases this test is translated into the requirement that the evidence exclude every reasonable hypothesis other than guilt. *Id.* at 159 n. 5. This rule does not release the prosecution from their burden of proving the essential elements of the crime beyond a reasonable doubt. *See In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368, 375 (1970).

> [A] conviction will not be sustained on appeal if the evidence does not sufficiently establish all material elements of the offense charged.

*Culmore v. State*, 447 S.W.2d 915, 916 (Tex.Crim.App.1969), *quoting* 24 TEX. JUR.2d *Evidence* § 742 (1961). Appellant was never identified as the burglar. There is no evidence to connect him as a party to the offense. No stolen property or tools were found in his possession when he was arrested, nor was he found in possession and control of the truck and safe. *Cecil Prescott, the chief security guard for Proler Steel Company, could have been called as a rebuttal witness. This leaves unchallenged appellant's statement that he was in Houston on the night of the burglary.*

### NEW STANDARD OF REVIEW

Most recently the Court of Criminal Appeals in *Jackson v. State*, 672 S.W.2d 801 (Tex.Crim.App.1984) reiterated the standard of review for circumstantial evidence cases declared in *Denby v. State*, 654 S.W.2d 457 (Tex.Crim.App.1983), as follows:

> *The opinion on rehearing in Denby noted that, 'if the evidence supports an inference other than the guilt of appellant, a finding of guilt beyond a reasonable doubt is not a rational finding'. 654 S.W.2d at 456.* Similarly, the *Denby* concurrence stressed that, 'Logic dictates that if there is a 'reasonable hypotheses' [sic] other than the guilt of the accused, then it cannot be said that the guilt has been shown' beyond a reasonable doubt.' 654 S.W.2d at 457.

*Jackson, supra; see Freeman v. State*, 654 S.W.2d 450, 456 (Tex.Crim.App.1983); *Carlsen v. State*, 654 S.W.2d 444, 449–50 (Tex.Crim.App.1983).

The State failed to effectively rebut appellant's explanation of his presence at the scene where the truck and safe were

found. The circumstantial evidence is insufficient to exclude every reasonable hypothesis except the guilt of appellant. I would deny the motion for rehearing.