John Wesley AMUNSON, Appellant,

v.

The STATE of Texas, Appellee.

No. 04–95–00029–CR.

Court of Appeals of Texas,
San Antonio.

June 26, 1996.

Dissenting Opinion by Justice Green
on Denial of En Banc Reconsideration
June 26, 1996.

Suzanne M. Kramer, San Antonio, for Appellant.

Barbara Hervey, Assistant Criminal District Attorney, San Antonio, for Appellee.

Before RICKHOFF, HARDBERGER and DUNCAN, JJ.

## OPINION

RICKHOFF, Justice.

John Wesley Amunson, appellant, was tried and found guilty of the offense of murder. Punishment was assessed at life in prison. Amunson now appeals the conviction raising six points of error. We reverse the judgment of the trial court and remand the case for a new trial.

### Sufficiency of the Evidence

■ In his first point of error, Amunson alleges the evidence is insufficient to support his conviction. When considering a sufficiency of the evidence allegation, this court must review all of the evidence in the light most favorable to the verdict and determine if any rational trier of fact could have found all of the essential elements of the offense proven beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Geesa v. State,* 820 S.W.2d 154 (Tex.Crim.App.1991). The standard of review is the same in both direct and circumstantial cases. The evidence must be such that a rational trier of fact could have found sufficient evidence of guilt beyond

a reasonable doubt. *Kapuscinski v. State,* 878 S.W.2d 248, 249 (Tex.App.—San Antonio 1994, pet. ref'd).

■ Although the reviewing court looks at all the evidence, only evidence supporting the verdict is ultimately considered. *Clewis v. State,* 922 S.W.2d 126, 132 n. 10 (Tex.Crim. App.1996). The purpose for reviewing all of the evidence is to determine what evidence supports the verdict. *Id.* A reviewing court must ultimately disregard evidence that does not support the verdict. *Id.*[1]

■ When reviewing the evidence, the appellate court is not jury number two. *See Moreno v. State,* 755 S.W.2d 866, 867 (Tex. Crim.App.1988). The jury as the trier of fact is the exclusive judge of the credibility of the witnesses and the weight given to the evidence. *See Sharp v. State,* 707 S.W.2d 611, 614 (Tex.Crim.App.1986), *cert. denied,* 488 U.S. 872, 109 S.Ct. 190, 102 L.Ed.2d 159 (1988). The jurors are also entitled "to draw reasonable inferences from basic facts to ultimate facts." *Dumas v. State,* 812 S.W.2d 611, 615 (Tex.App.—Dallas 1991, pet. ref'd); *see also Kapuscinski,* 878 S.W.2d at 249. When faced with conflicting inferences, the court must presume "—even if it does not

1. The dissent asserts that by reading footnote 10 "mechanistically," we have effectively reverted to a "no evidence" scope of review. The dissent's arguments expand on those raised by Presiding Judge McCormick in his dissenting opinion in *Clewis. See Clewis,* 922 S.W.2d at 155–56 & n. 7–8 (McCormick, J., dissenting). Although the dissent may disagree with the legal sufficiency scope of review as set forth in *Clewis,* we are unconvinced that our understanding of footnote 10 is merely "mechanistic."

Judge Meyers in his concurring opinion in *Clewis* states that the specific complaint raised by the appellant was that "the Court of Appeals refused to weigh exculpatory evidence in the balance when evaluating the rationality of the jury's verdict." *See Clewis,* 922 S.W.2d at 149 (Meyers, J., concurring). Footnotes 10–13 of the majority opinion in *Clewis,* therefore, appear to us to be an effort to directly address this complaint by explaining the reasons the exculpatory evidence is not weighed under *Jackson.* Judge Meyers concludes:

> This distinction between the contention that evidence is insufficient to prove a fact and the somewhat different contention that other evidence overwhelmingly disproves that fact is important in the present context because the kind of evidentiary review performed by appel-

late courts under the rubric established by the United States Supreme Court in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), plainly does not contemplate that a reviewing court consider the probative weight of exculpatory evidence when evaluating the sufficiency of the inculpatory evidence to sustain a criminal conviction.

*Id.*

The example cited by the majority in footnote 12 further clarifies that the scope of review used in this opinion is logical and consistent with the principles announced by the Court of Criminal Appeals:

> The prosecution's sole witness, a paid informant, testifies that he saw the defendant commit a crime. Twenty nuns testify that the defendant was with them at the time, far from the scene of the crime. Twenty more nuns testify that they saw the informant commit the crime. If the defendant is convicted, he has no remedy under *Jackson* because the informant's testimony, however, incredible, is legally sufficient evidence.

*Id.* 922 S.W.2d at 133 n. 12.

Therefore, having applied the *Jackson v. Virginia* standard and scope of review as clarified and explained in *Clewis,* we find the evidence to be legally sufficient. Our reversal and remand is based on a separate point of error.

affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Clewis v. State,* 922 S.W.2d at 133 n. 13 (Tex.Crim.App.1996).

This case involves the murder of an eleven-year old boy on November 11, 1992. The testimony reveals that the victim's father picked up Amunson, who was hitchhiking, and brought him to their home on November 10th. Amunson told the victim's father he was on the run from the law.

On the evening of the murder, Amunson made dinner at the house using a knife. Amunson also testified that he examined an antique wheelchair in the victim's house. The victim was left alone with Amunson when the father went to work at his evening job. When the victim's body was discovered, it was found that the child's head was bashed in and a large knife was buried in his back up to the hilt.

The victim's father testified that the knife found in the boy's back was one from his kitchen. A board which was broken in two was found lying near the victim with what appeared to be blood on it. There was testimony that the wood had been the backrest of the antique wheelchair in the victim's home. The medical testimony revealed that the victim had received several blows to the head which could only have been caused by the victim having been struck with a blunt object.

Amunson took the stand in his own defense and testified that he played Monopoly with the child and then left the house. The medical examiner's office received the victim's body at approximately 11:40 p.m. The medical examiner testified that the child had been dead for at least thirty minutes, but maybe up to five hours. Amunson claimed to have left the victim's home at approximately 6:30 p.m. The child's body was found at 10:30 p.m. by his father, and an officer arrived at the scene shortly thereafter. There was testimony that the father had worked until 10:00 p.m. at Koger Stokes ballpark.

Amunson admitted to having stolen a VCR and a Nintendo from the victim's home. Anthony Lehman testified that he met Amunson downtown at approximately 10:00 p.m. on November 11, 1992. He recalled that Amunson had told him that he had a VCR to sell and that he needed the money. Lehman's son-in-law purchased the VCR for $30.00. Lehman testified that Amunson also had a Nintendo to sell.

■ Amunson left Texas immediately after the murder. He hitchhiked to Florida where he began using the name John Allen Smith. He stated he was on the run for a parole violation and that was why he changed his name. Flight, though not dispositive, can be considered by the trier of fact as an indication of guilt. *See Alba v. State,* 905 S.W.2d 581, 586 (Tex.Crim.App.1995); *Livingston v. State,* 739 S.W.2d 311, 330 (Tex. Crim.App.1987), *cert. denied,* 487 U.S. 1210, 108 S.Ct. 2858, 101 L.Ed.2d 895 (1988); *McWherter v. State,* 607 S.W.2d 531, 535 (Tex.Crim.App.1980).

■ In summary, the circumstances indicating Amunson's guilt include the following facts: Amunson was left alone with the victim on the night of the murder; the victim was last seen alive with Amunson; Amunson admitted to being left alone with the victim on the night of the murder; Amunson stole a VCR and Nintendo from the victim's home on the night of the murder; Amunson was familiar with the kitchen and the knives kept there; Amunson was aware of the antique wheelchair at the victim's home; Amunson fled the state immediately after the murder. We hold that the evidence, when viewed in the light most favorable to the verdict, supports the jury's finding that Amunson was guilty of murder beyond a reasonable doubt. We overrule the first point of error.

### The Victim's School Records

In his second point of error, Amunson argues that the trial court erred in refusing to admit the victim's school records into evidence. At trial, Amunson sought to introduce the victim's school records into evidence through the custodian of those records. The trial court excluded the school records, stating the records have "really no relevance" and the probative value, if any, did not outweigh the prejudicial effect.

Amunson then narrated a bill of exceptions. The bill sets out that the decedent's father had been reported to the Department of Human Services ("DHS") for alleged child abuse. There were reports of bruises on the decedent's arms. The victim stated the bruises were caused by his father.

Amunson argues that exclusion of this evidence was harmful error because it tended to discredit the father's testimony regarding his relationship with his son. The state responds that the evidence is irrelevant because it does not relate to any of the elements of the charged offense.

■ Relevant evidence is that evidence which has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Tex.R.Crim. Evid. 401; *Montgomery v. State*, 810 S.W.2d 372, 375 (Tex. Crim.App.1990). In order to be relevant, it is sufficient if the evidence "provides a small nudge toward proving or disproving some fact of consequence." *Montgomery*, 810 S.W.2d at 376.

■ In this case, the defense raised a question as to whether the father, rather than Amunson, committed the offense. There was evidence that the father was the beneficiary of a life insurance policy on the victim, and Amunson testified that he believed the victim was afraid of his father. Specifically, Amunson stated he believed the father became irritated when the victim interrupted the father's conversation with Amunson, and the victim cowered when the father moved toward him after the victim refused to go to his room. In the DHS report, the victim stated his father would get mad at him for talking back and would hit him a lot when he was mad. This would tend to support Amunson's testimony regarding the victim showing fear when he refused to go to his room and his father approached him. Hence, the evidence would provide that "small nudge" toward proving or disproving some fact of consequence. Therefore, in the context of this case, the school records containing the abuse allegations are relevant. However, this does not end our inquiry.

Amunson must show harm from the exclusion of this evidence. *See* Tex.R.App. P. 81(b)(2). Amunson's defense is premised on the theory that someone else, possibly the father, was responsible for the murder. Amunson presented evidence that the father was investigated for the murder by a grand jury. During the trial, the father was questioned at length about his repeated invocation of his Fifth Amendment right to remain silent before the grand jury. Amunson also was allowed to question the father about the life insurance policy he took out on the boy in 1981. Further, Shirley Schuster, a nurse who worked for a neighbor of the father, testified that the father told her the victim tied him down and that he wanted to get rid of him. Most importantly, she testified to the existence of bruises on the child which was the same evidence contained in the school records.

While the testimony of Shirley Schuster was helpful to the defense theory, there is little doubt such testimony would not be given the same weight as an official investigation of potential abuse by the father only months prior to the child's death. Furthermore, the statements in the report as to the circumstances under which the father would hurt the child were consistent with Amunson's belief that the child feared being hit by the father for refusing to go to his room the night before his murder.

■ In a case like this, where there is only circumstantial evidence of Amunson's guilt and a clear motive on the part of the father, we believe the jury is entitled to the benefit of every piece of relevant evidence. We cannot find beyond a reasonable doubt that the error in excluding the school reports made no contribution to the conviction in the instant case. Tex.R.App. P. 81(b)(2). We sustain appellant's second point of error.

### Improper Expert Testimony

In his third point of error, Amunson alleges that the trial court erred in allowing a Sheriff's Deputy, Debbie P. Donais, to testify as to the medical condition of the victim. Amunson complains that Donais was not qualified to testify concerning the lividity

(pooling of the blood causing discoloration) present in the deceased.

Officer Donais testified that she was the first officer to arrive at the scene of the murder and described the following:

Q. Officer Donais, I want you to describe what you saw when you came into the house.

A. I walked in, and the first thing I saw was kind of a little mound with a cover over it. And then the father went ahead and lifted the cover up. And there was a young man. He was on his knees, his head on the ground. And protruding from his back was the handle of what looked like a large knife.

Q. Could you see any injuries on the child?

A. Yes, ma'am.

Q. What did you see, other than the knife?

A. Other than the knife? There were—a large area at the back of the head that was bloodied. He had blood on his face. One eye was partially open. You know, he looked like prior to the incident, in that his back was real clean and his hair looked like it had been freshly washed. And the blood that was in his hair was sort of kind of matted and looked like it was beginning to dry up some.

Q. Did you notice whether or not there was an odor about the child?

A. No, ma'am, there was not.

Q. Did you notice anything about his feet?

A. Yes, ma'am.

Q. Could you tell the jury what you saw?

A. There was just a little bit of lividity in the base of his feet right around his toes.

Q. Could you tell us what lividity is?

(Defense Counsel): Your Honor, I have to object at this time. There are other witnesses that can testify to things such as lividity. I don't think she has been qualified as an expert on lividity or any other postmortem.

The trial judge sustained this objection. The officer then testified that she had viewed other murder scenes and that she had seen other dead bodies. She also testified that she had received training in crime scene investigation and that she had been taught to look for certain things in dead bodies. The testimony continued in this vein:

Q. And in that, when they teach you to notice those kinds of things, what are some of the things they teach you to notice?

A. They teach you to notice lividity, rigor mortis, the condition of the body, of course, and, you know, some of it has to deal with time factors, as far as the time of death or possible length of time that the person may have been dead.

Q. Now, when we use rigor mortis or lividity, of course those have medical terms. But what is your understanding of what lividity is?

(Defense Counsel): Your Honor, I object to this line of questioning. This officer is not an expert in this field. This is a field of a pathologist in the Medical Examiners Office.

THE COURT: That's overruled.

THE WITNESS: Okay. My understanding of it is that when a person dies, the blood that's in the body will pool at the lowest point in the body by gravity. And that pooling causes kind of a bluish tint, almost like bruising.

The witness went on to state, over defense counsel's objection, that rigor mortis had set in. The witness then explained the basis for her conclusion.

 The testimony was admissible under both Tex.R.Crim. Evid. 701 and 702. The witness testified to both her training and her experience in investigating murder scenes. Thus, her testimony is admissible under 701 because it is based on first hand knowledge. The testimony is also admissible under 702 because of her training and experience. *Yohey v. State,* 801 S.W.2d 232, 243 (Tex.App.—San Antonio 1990, pet. ref'd). Further, the same testimony was given by John Hearn, an investigator with Bexar County Sheriff's Department, without objection. Even if the evidence had been inadmissible, any error in admitting it was rendered harmless because the same testimony was given by another witness without objection.

*Anderson v. State,* 717 S.W.2d 622, 628 (Tex. Crim.App.1986). We overrule Amunson's third point of error.

### Hearsay

In his fourth point of error, Amunson alleges the trial court erred in allowing the hearsay testimony of a State's witness. Specifically, Amunson complains about testimony from Officer Donais that the father had told her that he had left the boy in another person's care. The defense attorney objected to the testimony on the basis that it was hearsay. The trial judge overruled the objection because it was untimely.

■ The defendant must lodge a timely and specific objection in order to complain on appeal about the trial court's admission of improper testimony. TEX.R.APP. P. 52; TEX. R.CRIM. EVID. 103(a); *Armstrong v. State,* 718 S.W.2d 686, 699 (Tex.Crim.App.1985); *Yohey,* 801 S.W.2d at 245. An objection made after the objectionable testimony has been given is untimely, and any potential error is waived. *Yohey,* 801 S.W.2d at 245. Here, the objection was not made until after the complained-of testimony had been elicited. Nothing is presented for review. *Durkovitz v. State,* 771 S.W.2d 12, 15 (Tex.App.—San Antonio 1989, no pet.). The fourth point of error is overruled.

### Out-of-Court Statement

In his fifth point of error, Amunson alleges the trial court erred in allowing testimony in contravention of Article 38.22 of the Texas Code of Criminal Procedure. Amunson also complains of the lack of findings by the trial court on the issue of the voluntariness of the statement.

Amunson filed a written motion to suppress the statement he made to Lt. Bud Baker of the Bexar County Sheriff's Department in which he alleges that the statements made were "involuntary, coerced and/or enticed from the Defendant." A hearing was held outside the presence of the jury regarding the oral statements made by the defendant. Lt. Baker testified that he went to Florida in December 1992 in order to execute an arrest warrant for Amunson in connection with the murder in this case. Lt. Baker testified that he met the defendant in an interview room in a Florida jail, at which time they read him his rights and explained to him that they were going to take him back to Texas.

The trip began the next morning. Lt. Baker informed the defendant of the reason for the return to Texas and asked the defendant if he would be willing to talk to them about the case. Amunson was not read his rights at this time. The officer testified that they were merely having a conversation and that he was not interrogating him. Amunson told him that on the evening in question he had cooked dinner and played Monopoly with the deceased, that the father had left for work and that he decided it was time to leave. He recalled that it was approximately 6:30 or 7:00 p.m. when he left the victim's home and that he took a VCR when he left to sell because he needed the money. He later recalled also having taken a Nintendo game which he left under a bridge in a canvas bag. Amunson said that when he left the victim's house the boy was alive; that he did not kill him. None of the conversation was reduced to writing, except in the officer's reports.

Following this hearing the Court made these findings:

THE COURT: First of all, the Defendant knew he was under arrest. He was in custody. His rights were read to him on December 7th, 1992 at 9:00 p.m.

Number three, he never stated that he didn't want to talk to the officers. Number four, he was never promised anything to get him to talk. Number five, there is no evidence the he was harassed or coerced or threatened in any manner. He was not denied food or drink during the 18 hours on this trip back to Texas.

The Court finds that the statements were made freely, voluntarily without compulsion or persuasion. And finally, the statements are admissible.

■ Initially, we consider Amunson's claim that the trial court erred in failing to make findings of fact in compliance with section 38.22, Texas Code of Criminal Procedure. Where a trial court conducts a hearing

pursuant to *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), out of the jury's presence, it is proper for the trial court to dictate its findings and conclusions to the court reporter at the end of the hearing. When those findings have been transcribed and made a part of the record without objection, there has been a sufficient compliance with Article 38.22. *Parr v. State,* 658 S.W.2d 620, 623 (Tex.Crim.App.1983). Accordingly, that portion of Amunson's argument is overruled.

As to the admissibility of the oral statements, it is important to note that Amunson took the stand on his own behalf. His testimony at trial concerning his connection to the victim was exactly the same as the oral statement he gave to Lt. Baker. Therefore, we need not address the admissibility of the oral statement. An erroneous admission of the oral statement is rendered harmless when the defendant subsequently testifies to the same facts. Here Amunson gave the same facts elicited through Lt. Baker. There is no evidence that the defendant was forced to testify to overcome the impact of anything Lt. Baker said. When the defendant offers the same evidence to which he earlier objected, he is not in a position to complain on appeal. *Jones v. State,* 843 S.W.2d 487, 493 (Tex.Crim.App.1992), *cert. denied,* 507 U.S. 1035, 113 S.Ct. 1858, 123 L.Ed.2d 479 (1993); *Maynard v. State,* 685 S.W.2d 60, 65 (Tex.Crim.App.1985). We overrule Amunson's fifth point of error.

### Witness Reports

In his sixth point of error, Amunson alleges that the trial court erred in failing to strike the testimony of two state's witnesses in violation of Rule 614, Texas Rules of Criminal Evidence. Amunson complains that he requested the written reports of two officers testifying at trial on behalf of the state.

Officer Donais stated that she had an opportunity to review her report before testifying. A copy of the report was tendered to Amunson's attorney. However, he claimed that it was illegible. A second copy was located, but that copy was missing the second page. Officer Donais stated that the copy that was difficult to read was the one she used to refresh her memory before testifying. Officer Donais also testified that there was a computer generated copy that was tendered to defense counsel. The officer testified that the difference with a computer generated copy would be a few changes. Defense counsel was provided with the exact copy used by the officer to refresh her memory, a computer generated report with a few differences, and a more legible copy.

Rule 614 of the Texas Rules of Criminal Evidence requires the state to produce "any statement of the witness that is in their possession ..." In this case, there has been no showing that the state failed to produce any statements to defense counsel that was in their possession. *Marquez v. State,* 757 S.W.2d 101, 102–103 (Tex.App.— San Antonio 1988, pet. ref'd).

Officer Stang also testified regarding the investigation of this homicide. He stated that he made a report in this case but was unable to find it. The record shows that there was no report to tender to counsel and thus Rule 614 was not violated. Amunson's sixth point of error is overruled.

### CONCLUSION

Because we sustained appellant's second point of error, the judgment of the trial court is reversed, and the case is remanded for a new trial.

*DUNCAN, Justice, dissenting.*

I respectfully dissent. In my view, no rational person could believe that the evidence establishes beyond a reasonable doubt that Amunson killed Vincent Matteo.

### REVIEW UNDER A "NO EVIDENCE" SCOPE OF REVIEW

The majority holds that "the evidence, when viewed in the light most favorable to the verdict, supports the jury's finding that Amunson was guilty of murder beyond a reasonable doubt." In reaching this conclusion, however, the majority recites only "the circumstances indicating Amunson's guilt...." As discussed below, I disagree with the majority's use of the "no evidence"

scope of review.[1] But even under the majority's analytical construct, and despite its attempt to make the inculpating evidence appear substantial, the recited facts establish no more than opportunity, flight, and burglary:

1. **Opportunity**—"Amunson was left alone with the victim on the night of the murder; the victim was last seen alive with Amunson; Amunson admitted to being left alone with the victim on the night of the murder;" ... "Amunson was familiar with the kitchen and the knives kept there; Amunson was aware of the antique wheelchair at the victim's home;"

2. **Flight**—"Amunson fled the state immediately after the murder;" and

3. **Burglary**—"Amunson stole a VCR and Nintendo from the victim's home on the night of the murder."

Under the majority's "no evidence" scope of review, therefore, the question is whether this circumstantial evidence is sufficient for a reasonable juror "to reach a subjective state of *near certitude* of the guilt of the accused...." *Jackson,* 443 U.S. at 315, 99 S.Ct. at 2787 (emphasis added).

Clearly, none of the circumstances cited by the majority, standing alone, is sufficient to establish guilt beyond a reasonable doubt. *See, e.g., Burns v. State,* 676 S.W.2d 118, 120 (Tex.Crim.App.1984) (en banc) ("The mere presence of [the defendant] at the scene of the offense is insufficient to prove that he committed the offense charged."); *Nathan v. State,* 611 S.W.2d 69, 78 (Tex.Crim.App. [Panel Op.] 1981) (fact that a defendant was the last to see a victim alive creates nothing more than a "suspicious circumstance"), *overruled on other grounds, Matson v. State,* 819 S.W.2d 839, 842–43 (Tex.Crim.App.1991);

*Flores v. State,* 551 S.W.2d 364, 367–69 (Tex. Crim.App.1977) (possession of a victim's property, if unexplained, can indicate guilt of robbery but fails to support a conviction for murder without other evidence of guilt); *Holloway v. State,* 525 S.W.2d 165, 167 (Tex. Crim.App.1975) (while flight may evince guilt, it does not prove guilt beyond a reasonable doubt).[2]

It is also well-established that "[p]resence in the vicinity of a crime and flight are not alone sufficient to conclude, beyond a reasonable doubt, that the accused committed the offense." *King v. State,* 638 S.W.2d 903, 904 (Tex.Crim.App.1982). Thus the question becomes whether opportunity and flight are made sufficient—could establish in a reasonable person "near certitude" of Amunson's guilt—by the addition of his stealing Matteo's VCR and Nintendo. In my view, to state the question is to answer it. No rational person could reasonably believe with "near certitude" that opportunity, flight, and burglary establish Amunson murdered Vincent Matteo. At most this circumstantial evidence creates a "strong suspicion" or "mere probability"—but neither of these is sufficient to support Amunson's conviction. *Denby v. State,* 654 S.W.2d 457, 462 (Tex.Crim. App.1983), *overruled on other grounds, Geesa v. State,* 820 S.W.2d 154, 161 (Tex.Crim. App.1991).

A closely analogous case to this is *Turner v. McKaskle,* 721 F.2d 999 (5th Cir.1983). In *Turner,* "[t]he government point[ed] to four facts which [were] allegedly sufficient, in combination, to establish Turner's guilt [of murdering Clifford Carr] beyond a reasonable doubt: (1) the fact that Turner admitted [in his written statement] being with Carr on the day of the murder; ... (2) his presence

---

1. Cf. W. WENDELL HALL, Revisiting Standards of Review in Civil Appeals, 24 St. Mary's L.J. 1041, 1049 (1993) ("The standard of review should be carefully distinguished from the scope of review. The applicable standard of review determines whether the trial court has committed an error. The scope of review defines what the reviewing court will examine to determine whether the trial court has committed an error. In other words, the scope of review defines what part of the record is relevant to a particular appellate complaint.").

2. In applying the *Jackson* standard for legal sufficiency, the reviewing court should consider state evidentiary rules. *See Turner v. McKaskle,* 721 F.2d 999, 1003 (5th Cir.1983) (citing *Moore v. Duckworth,* 443 U.S. 713, 99 S.Ct. 3088, 61 L.Ed.2d 865 (1979) (per curiam)). Consideration does not, however, require "rigid adherence" because the question is not whether the evidence is sufficient under state law, but whether it is sufficient "to satisfy federal due process." *Turner,* 721 F.2d at 1003.

near the scene of the crime; (3) his departure from Texas the day after the murder;[3] and (4) his possession of some of Carr's personal belongings." *Id.* at 1001 (footnote omitted). Reviewing Texas caselaw, the Fifth Circuit Court of Appeals held that this evidence was insufficient to meet the *Jackson* standard. *Id.* at 1003.

In short, even under the majority's "no evidence" scope of review, the evidence is legally insufficient to support Amunson's conviction. This conclusion is buttressed by application of the correct scope and standard of review.

### STANDARD AND SCOPE OF REVIEW

The majority's reliance on a "no evidence" scope of review is based upon footnote 10 in *Clewis v. State*, 922 S.W.2d 126, 132 n. 10 (Tex.Crim.App.1996), which states:

> The court of appeals' opinion stated that a correct standard of review under *Jackson* must include a review of *all* of the evidence adduced at trial to determine the sufficiency of the evidence to prove the elements of the offense. *Clewis [v. State ]*, 876 S.W.2d [428] at 436 [(Tex.App.-Dallas 1994)]. While the court of appeals correctly noted that *Jackson* specifically requires appellate courts to look at *all* the evidence, in Texas, we have applied *Jackson* in such a way that the only evidence a reviewing court considers is the evidence that supports the verdict. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex.Crim.App.1991) (holding that the jury is the sole judge of the credibility of the witnesses and may choose to believe all, some, or none of the testimony); *Burns v. State*, 761 S.W.2d 353, 355–56 (Tex.Crim.App.1988) (holding that reconciliation of conflicts in the evidence is within the exclusive province of the jury); *Losada v. State*, 721 S.W.2d 305, 309 (Tex.Crim. App.1986).

*Clewis*, 922 S.W.2d at 132 n. 10. The majority reads footnote 10 mechanistically and ef-

fectively reverts to the "no evidence" scope of review, despite the fact the "no evidence" standard itself was abandoned by the Court of Criminal Appeals in *Griffin v. State*, 614 S.W.2d 155, 159 (Tex.Crim.App. [Panel Op.] 1981). Using this "no evidence" scope of review as its starting point, the majority isolates the evidence supporting the verdict, views this evidence in the light most favorable to the verdict, and then determines that, because there is some evidence to support the verdict, Amunson's legal sufficiency challenge must be rejected. Classic "no evidence" review. *See, e.g., Banks v. State*, 510 S.W.2d 592, 595 (Tex.Crim.App.1974), *overruled by Butler v. State*, 769 S.W.2d 234, 239 (Tex.Crim.App.1989).

I disagree with the majority's application of the "no evidence" scope of review for three reasons. First, the United States Supreme Court has already held that the "no evidence" standard of review fails to meet the constitutional due process requirements of the Fourteenth Amendment. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In *Jackson* the lower federal courts, like the majority, applied the "no evidence" standard to review the sufficiency of the evidence to support the conviction, and it was on this precise point that the Supreme Court granted a writ of certiorari. *Id.* at 312, 99 S.Ct. at 2785. To demonstrate why it was "readily apparent" that the "no evidence" standard is "inadequate to protect against misapplications of the constitutional standard of reasonable doubt," the Court stated:

> "[A] mere modicum of evidence may satisfy a 'no evidence' standard.... *Jacobellis v. Ohio*, 378 U.S. 184, 202, 84 S.Ct. 1676 [1686], 12 L.Ed.2d 793, 28 Ohio Ops.2d 101 (Warren, C. J., dissenting). Any evidence that is relevant—that has any tendency to make the existence of an element of a crime slightly more probable than it would be without the evidence, cf. Fed Rul Evid

---

3. "Turner was an *itinerant* worker with no fixed home, who had recently been asked to move out of his girlfriend's home." *Turner*, 721 F.2d at 1002. Based upon this fact, the court discounted the government's allegation of flight for two reasons. First, "Turner's trip to Denver was not clearly flight rather than mere 'traveling about.'

Second, if Turner did not shoot Carr, but Crow did, Turner's 'flight' to Denver could be attributed to fear that he would be held responsible for Carr's death, as indeed he was." *Id.* Similar evidence admitted at the trial of this case detract from viewing Amunson's "flight" as evidence of his guilt.

401—could be deemed a "mere modicum." But it could not seriously be argued that such a "modicum" of evidence could by itself rationally support a conviction beyond a reasonable doubt."

*Jackson,* 443 U.S. at 320, 99 S.Ct. at 2789. Having rejected the "no evidence" standard as constitutionally inadequate, the Court held that the minimum standard for reviewing the legal sufficiency of the evidence, consistent with the due process guarantee of the Fourteenth Amendment, is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319, 99 S.Ct. at 2789 (emphasis in original). By interpreting footnote 10 as it does, therefore, the majority imputes to the Court of Criminal Appeals a reversion to one aspect of a constitutionally inadequate standard of review. And in applying the "no evidence" scope of review, the majority engages in a legal sufficiency analysis that had already been determined by the United States Supreme Court to be constitutionally infirm.

My second basis for disagreeing with the majority's interpretation of footnote 10 in *Clewis* and its resulting adoption of a "no evidence" scope of review is simply that it defies common sense, logic, and traditional principles of legal analysis to conclude, as the majority apparently does, that the Court of Criminal Appeals both affirmed and abandoned the *Jackson* standard in one footnote in one case. I find this particularly unlikely since this one case is *Clewis,* which does not turn upon the *Jackson* standard but whether the Texas Constitution requires Texas Courts of Appeals to conduct factual sufficiency review in criminal cases. *Clewis,* 922 S.W.2d at 128. Even a cursory reading of footnote 10 demonstrates that it inadvertently confuses the *Jackson* scope of review with one aspect of the *Jackson* standard of review.

Under *Jackson,* the scope of review is all of the evidence before the jury. The standard of review is two-fold: (1) viewing all of the evidence in the light most favorable to the prosecution, (2) the reviewing court must determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789 (emphasis in original). The cases cited in footnote 10 reflect appropriate applications of the first aspect of the *standard* of review, *i.e.,* viewing all of the evidence in the light most favorable to the prosecution, all conflicts in the evidence and credibility determinations are resolved in favor of the prosecution. *Id.* at 319, 99 S.Ct. at 2789. But these cases have nothing to do with the *scope* of review, *i.e.,* reviewing all of the evidence before the jury. Disregarding the nature of the cited cases, the majority simply interprets footnote 10 mechanistically and abandons the *Jackson* scope of review in favor of the pre-*Jackson* "no evidence" scope of review.

Finally, I fail to see how this court or any other can answer the *Jackson* question with a "no evidence" scope of review, that is by looking only at the evidence supporting the conviction. Surely *Jackson*'s "rational trier of fact" would not find guilt beyond a reasonable doubt merely because some evidence supports guilt—when other evidence, or the absence of certain evidence, raises reasonable doubt. *See Jackson,* 443 U.S. at 317 n. 9, 99 S.Ct. at 2788 n. 9 (reasonable doubt may arise from evidence or lack of evidence).

For these reasons, I believe the standard and scope of legal sufficiency review post-*Clewis* remains the *Jackson* standard, not the "no evidence" standard adopted by the majority. I also believe this very difficult case forcefully demonstrates the difference and why the *Jackson* standard can only be considered legitimately in the context of all the evidence before the jury. The majority recites the evidence supporting the verdict. Here, as Paul Harvey would say, is "the rest of the story."

## REVIEW UNDER THE *JACKSON* SCOPE AND STANDARD OF REVIEW

### The Evidence Before the Jury

On November 11, 1992, the Bexar County Sheriff's Department responded to a call on Mallow Drive north of San Antonio. When Officer Donais arrived, she found a young boy, Vincent Matteo, sitting cross-legged in

front of the TV in the living room. Vincent had been stabbed in the back with a butcher knife, and his spinal cord had been severed by repeated blows to his head "in such a fashion that his entire brain was turned to mush." Although the boy's father, Anthony Matteo, was a suspect in the case for over a year, the grand jury ultimately indicted John Wesley Amunson, a hitchhiker Matteo had picked up and taken home the day before the murder. At trial, both Matteo and Amunson testified. Without explanation from the State, Matteo's friend, Gilbert Garcia, who was also with them the afternoon of the murder, did not testify.

*Anthony Matteo*

At the time of trial, Matteo was a forty-six year old homosexual who for many years had been a member of the armed services. From 1969 to 1977, Matteo was married to Shelva Diebler. The couple divorced approximately two years after Matteo left regular service under an early-out program in 1975. In September 1979, however, after Matteo was accepted into a tour of active duty, Matteo married again, this time to Cheryl Gaddy, a resident of Alaska, where Matteo was then stationed. According to Matteo, his marriage to Gaddy was strictly a marriage of convenience. Matteo wanted to look "more normal" for his tour of active duty at Randolph Air Force Base in San Antonio, Texas.

Matteo and Gaddy had only lived together for a couple of months when Gaddy returned to Alaska. Nonetheless, in December 1981, Matteo and Gaddy, as husband and wife, legally adopted Matteo's niece's baby, Vincent. Although Matteo's niece knew Matteo was once a homosexual, Matteo believed she and his other family members assumed he was no longer a homosexual in light of his marriage to Gaddy. Shortly after adopting Vincent, Matteo purchased a whole life insurance policy on Vincent's life; Matteo planned to finance Vincent's college education by borrowing against this policy at a low interest rate. The face amount of the policy was $65,000.

In 1983, Matteo met and became lovers with Henry Bailey.[4] In September 1984, when Matteo's active tour of duty was over, he again separated from the armed services, receiving separation pay of $26,000. Matteo, Bailey, and Vincent then returned to Alaska. Bailey, however, did not like Alaska, and the three returned to Texas a couple of months later. With Matteo's $26,000 in separation pay, the couple bought a beauty shop in Austin, Texas. The beauty shop failed, and Matteo lost his investment.

In November 1985, Matteo and Bailey broke off their relationship. A few months later, in February 1986, Matteo reenlisted. Six years later, effective January 1, 1992, Matteo retired from the armed services and moved with Vincent into a rental house in North San Antonio. For most of 1992, Matteo was unemployed. Additionally, since he had to pay back the $26,000 he had received in the early-out program, Matteo's retirement check was reduced by 75% to approximately $250 to $300 a month until the $26,000 was paid off. Accordingly, to pay for their living expenses, Matteo took out a $6,000 loan, collateralized by the $11,000 in his credit union account.

By October 1992, Matteo had only a couple of thousand dollars left in his credit union account, and he began to supplement his retirement income with the income from two part-time jobs. During the day, Matteo worked as a home health care worker for various agencies. In the evenings, Matteo worked for the City of San Antonio as a gatekeeper at local softball parks. Matteo's total gross monthly income was then about $1280.

About twice a week, Matteo would pick up male hitchhikers and take them home for a one-night stand. And so it was that, at approximately 2:30 p.m. on Tuesday, November 10, 1992, when Matteo was on his way home from work, he stopped to give a ride to a hitchhiker, John Amunson. Amunson said he was on his way to Waco to look for work.

---

**4.** At the time of trial, Bailey was living in Austin and physically unable to travel to San Antonio. Amunson's counsel sought leave of court to take a deposition of Bailey, purportedly because Bai- ley would testify that Matteo was violent, and Bailey was afraid of him. The trial judge refused to permit the deposition.

Amunson was very friendly and seemed to Matteo to be a person down on his luck. Amunson told Matteo he had a child about Vincent's age. Matteo asked if Amunson was in a hurry, and he said "no." Matteo then told Amunson that he was moving and could use some help. Amunson agreed to help, and the two returned to Matteo's house, where they met Matteo's son, Vincent. After the three ate a fish sticks dinner that Matteo had prepared, Matteo and Amunson made three or four trips to Matteo's new apartment. Later that evening, the two men drank beer, watched TV, and had sexual relations in Matteo's bedroom.

The next morning, Vincent went to school, and Matteo went to work. Since Amunson was still asleep, Matteo left him a note on the kitchen table indicating he would return around 2:30 p.m. and would pick up some beer on his way home. By the time Matteo returned to the house about 11:30 a.m., Amunson was awake. Matteo told him he would return around 2:30 p.m. Around 2:20 p.m., Matteo picked up his friend Gilbert Garcia at the San Antonio AIDS Foundation and then returned home. Matteo started packing, while Amunson cooked dinner, using some canned goods he had brought with him and a chicken set out by Matteo. Around 4:00 or 4:30 p.m., the three men and Vincent ate dinner.

Sometime that afternoon, Matteo gave Amunson $20. Also that afternoon, Matteo received a phone call instructing him to go to work that night. He therefore cancelled his moving plans and, at approximately 5:30 p.m., proceeded to work. He dropped Garcia back off at the San Antonio AIDS Foundation. Vincent and Amunson stayed at home. When Matteo left, Vincent and Amunson were playing Monopoly.

Since Amunson had said he would help at the yard sale that Saturday, Matteo expected him to be at the house when he returned that evening at 10:20 or 10:30 p.m. When Matteo entered through the back door, he saw a blanket on the floor in the living room and thought that was a "stupid" place for Amun-

son to be sleeping. He then went in the kitchen and deposited his briefcase and keys on the table and checked his messages. After returning one of the calls, Matteo went into Vincent's room to turn off the TV. Vincent was not in his bed. Matteo then ran into his bedroom to find Amunson. No one was there. Matteo then went into the living room and lifted the blanket. He saw Vincent on his knees laying on the left side of his head. Thinking he was asleep, Matteo bent down to pick him up. Vincent was cold. Only then did Matteo see the kitchen knife in Vincent's back; he saw no blood. Matteo called 911, and an officer arrived shortly after 10:35 p.m.

When asked for a suspect, Matteo described Amunson and gave his name as John or J.J. With an officer's help, Matteo put together a composite, which aired on TV that night. The following day Matteo gave a statement to the Bexar County Sheriff's Department. In this statement Matteo reportedly said that he touched the knife in Vincent's back and then called 911. Sometime after this statement was given, Matteo learned that there were no fingerprints on the knife. At trial, Matteo testified that he did not touch the knife, and he did not know why his statement indicated that he said that he had.

Within a couple of days of Vincent's murder, Matteo submitted a claim on Vincent's whole term life insurance policy.[5] The death benefit on this policy was approximately $104,000. As a result of Vincent's death Matteo also inherited assets valued at approximately $14,000.

On September 18, 1993, Matteo appeared before the grand jury as a suspect. His attorney sat in the hall outside. On the advice of this attorney, in response to every question posed of him—including his age, whether he had any affection whatsoever for his adopted son, whether he knew any of the people in a long list of names, whether he killed his son, whether he knew anything about the cause of his son's death, and whether he would help with the investiga-

---

5. On cross-examination, Matteo changed his testimony and said he submitted his claim the week

following Vincent's death.

tion—Matteo invoked his Fifth Amendment right against self-incrimination. At trial, Matteo said he did so because he was "offended" by the nature of some of the State's questions. In Matteo's view, the State's questions were sometimes "accusatory" and sometimes implied that he felt less for Vincent because he was adopted.

In January 1994, the grand jury indicted Amunson for the murder of Vincent Matteo, but Matteo didn't learn of the indictment until May. In October, the case went to trial. At trial, Matteo denied killing Vincent and expressed his belief that Amunson had murdered his son. Matteo testified that, at the time Vincent was murdered, the life insurance policy on Vincent's life was located in the bookshelf by the TV, and he denied telling Amunson about it. Matteo further denied that he had engaged in sadomasochistic sex; he testified that the S & M paraphernalia at his home was left to him by a friend, and he simply kept it in a box in the closet.

### Don Kiolbassa

At the time of trial, Kiolbassa was the service analyst and records custodian for VIA Metropolitan Transit. Kiolbassa testified at length about the bus schedules between Matteo's home and downtown San Antonio.

### Amarel Hubbard

Sergeant Hubbard is the composite kits operator who created a composite of Amunson from Matteo's description.

### Anthony Lehman

Anthony Lehman, a sous chef at the Holiday Inn Riverwalk North, testified that he left the Holiday Inn and walked to the bus stop at St. Mary's and Commerce Streets sometime between 9:30 and 10:00 p.m. After missing his bus, Lehman called his son-in-law, George De Los Santos, to pick him up. While waiting for De Los Santos, Lehman was asked to watch the bags of a man he identified at trial as Amunson, while he went to a nearby store to get a beer. After a few minutes, Amunson returned with a quart of beer and thanked Lehman. Lehman testi-

fied that Amunson seemed like "a very nice person" and "polite." The two men began talking, and Amunson told Lehman that he had gotten into an argument with his wife, had left their house in Corpus Christi, and was hitchhiking north out of town. Amunson also told Lehman he needed some money and had a VCR to sell. Lehman had no money, but he relayed the conversation to De Los Santos when he arrived, and De Los Santos indicated that he wanted to buy the VCR. Lehman and De Los Santos then went to a nearby cash machine on Main Street. When they returned to St. Mary's and Houston, they asked Amunson to get in the car so he could show them the VCR. Amunson did so, and De Los Santos bought the VCR for $30. Amunson said he also had a Nintendo and a leather jacket to sell, but Lehman told him they were not interested. Lehman then asked Amunson if he would like a ride somewhere. Amunson replied that it didn't matter where they dropped him off. De Los Santos therefore left Amunson near the SAM shelter on West Commerce. Lehman and De Los Santos then went home.

At trial, Lehman testified that when he recognized Amunson as the man depicted in the composite that aired on TV the evening following Vincent's murder, he called the police. The police came to his home and picked up the VCR. A few days later Lehman gave a statement. At trial, Lehman identified Matteo's VCR as the VCR his son-in-law purchased from Amunson.

### Debbie P. Donais

At approximately 10:30 or 10:35 p.m. on November 11, Officer Donais was working the swing shift (3:00 to 11:00 p.m.) when she received a "Code 3" call dispatching her to Matteo's home. A Code 3 call means the officer is to arrive as quickly and as safely as she can. Donais therefore turned on her lights and siren, took the next exit, turned around, and proceeded to Matteo's house. As she was pulling up to the house, she saw Matteo in the roadway waving his arms and motioning her into the house. Donais followed Matteo into the house. Matteo, who was still on the phone with 911, asked Donais if she needed to speak with the 911 dispatch-

er and picked up the blanket to reveal Vincent, "on his knees with a knife [handle] protruding from his back...." Donais told Matteo she did not need to speak with 911 and to hang up. Matteo did so. Donais and Matteo then went into the kitchen, and Donais began taking down information for her report. Matteo identified Vincent as his child and gave his date of birth. According to Donais, Matteo was "real, real excited, kind of antsy like" but not "really emotional." Matteo told Donais that "he stepped out of the house," so she asked him if he had left anyone with his son. Matteo said "yes," "a hitchhiker that he picked up a couple of days before" named John Amunson or something similar. Matteo also gave Donais a physical description of Amunson and told her his VCR was missing. Donais then called in the description to the dispatcher. Other officers, as well as EMS, then arrived, and the scene was secured and the investigation begun.

### Randall Stang

Officer Stang was dispatched to Matteo's home at approximately 10:30 p.m. When he arrived, Donais was coming out of the house; she looked shocked. Stang walked in and saw a body with an afghan over it; the body had a hump on it. When Stang pulled off the afghan, he saw a boy lying in a fetal position trying to protect his head, which had a couple of large gashes in it. There was a knife stuck in the boy's back all the way down to the handle. Stang had never seen a child brutally killed like that and was shocked.

Stang next went in the kitchen to talk with Matteo. He was unable to remember much of what happened after that. He did remember that he learned that someone with a nickname was staying at the house; he saw a note from someone saying they would return at a certain time and would pick up some beer, and it was signed with someone's nickname. Stang testified that he later learned that this was a roommate of Matteo's. He also recalled that Vincent, whom Stang believed to be ten or twelve, was not wearing a shirt and was covering his head. Stang also recalled that there was a broken rocking chair nearby. He did not touch the boy and did not pay any attention to his feet. After

talking with Matteo, Stang sealed the scene. Although he made a report, he was not able to find it before trial.

### John Hearn

Investigator Hearn was called at home at approximately 11:10 p.m and told to respond to the call at Matteo's home. When he arrived, Chief DeLesdernier and Officer Donais took him on a brief tour of the scene. Hearn, assisted by Sergeant Sanchez, began taking photographs and measurements. Hearn also looked for anything out of place, as well as signs of forced entry. Although the house was in disarray, and the back door was open, there were no signs of forced entry. The back door may have been opened after the sheriff's officers arrived.

Hearn saw a boy in a sitting position, with his legs crossed and his body leaning forward. There was a knife with a wood handle sticking out from his back. Hearn also noticed splattered blood on a half-empty Schafer beer can and a wash cloth on the coffee table; an open, empty cash box on the love seat next to Vincent; a broken board from the wheelchair, which appeared to be spattered with blood; a bloody red robe, which was on a cushion that was at the top of Vincent's head; and a pair of shorts on Vincent's left shoulder. Hearn was not able to pick up any identifiable fingerprints from either the knife or the board. Amunson's prints were found on Monopoly cards and the can of Schafer beer found in the living room and on an applesauce can label recovered from the kitchen. Only Matteo's fingerprints were found on the glass jar that Matteo delivered to the sheriff's office on or about November 16. Hearn further testified that the photographs indicated lividity in the bottom of Vincent's feet and on his stomach. Finally, Hearn testified that when he picked Vincent up, he was in the first stages of rigor mortis. On cross-examination Hearn identified a photograph depicting three leather collars with metal studs displayed on Matteo's bed.

### Daniel Sanchez, Jr.

Sergeant Sanchez was also called at home at approximately 11:20 or 11:30 p.m. and

dispatched to the Matteo residence. He arrived at 11:56 p.m. After receiving a brief summary of the scene, Sanchez walked into the living room and could "right away" see Vincent's body in what appeared to be a squatting position by the coffee table. As he got closer, Sanchez saw the handle of a knife protruding from between Vincent's shoulder blades.

Matteo's house was in disarray, like it had not been picked up for a long time. Sanchez assisted Hearn in taking photographs and measurements, sketching the crime scene, and collecting evidence. By the time Sanchez and Hearn moved Vincent's body at 1:00 a.m., rigor mortis had set in, and lividity was present on Vincent's stomach, chest, and feet. On cross-examination, Sanchez agreed that Matteo's house was filthy.

### Bill Rodriguez

Rodriguez was an employee and the custodian of records for the City of San Antonio's Parks and Recreation Department. Rodriguez testified that the City's time records for Matteo for November 11 showed that he began work at 6:00 p.m. and left at 10:00 p.m. He was paid for four hours. The records further showed that $26.25 was collected for the 105 tickets sold for the game that evening.

### Camilo Villanueva

Villanueva was the grounds keeper at the ball park where Matteo worked as gatekeeper on the evening of November 11. The score keepers were Johnny Lopez and Herman Cortez. According to Villanueva, he arrived at the ball park at 6:00, "as always." Matteo was waiting in his car and met Villanueva at the gate. Both men went about their duties. Villanueva saw Matteo at various times during the evening and for a few minutes sat for Matteo while he went to the bathroom or got a soda. Villanueva testified that he also saw Matteo between 10:00 and 11:00 p.m. Matteo was at the bleachers watching the game after he had finished his work. According to Villanueva, Matteo usually finished selling tickets during the third inning, around 10:00 p.m. Matteo then picked up his table, chairs, and flags and

filled out a cash report. This took around fifteen to twenty minutes. Villanueva left at 11:00 p.m., and Matteo left before him. Villanueva met Matteo through work and is not a social friend. He described Matteo as a "friendly, quiet person." On cross-examination, Villanueva testified that he is now a gatekeeper for the City and enjoys his work.

### Herman Cortez

As noted by Villanueva, Cortez was a scorekeeper at the ball park on November 11. He met Matteo through work; the two men were not social friends. Cortez testified that he arrived at the ball park at 6:00 or 6:15 p.m., and the first person he saw was Matteo. Matteo had already set up his table and was sitting at the gate. Matteo appeared no different than usual, but he was always quiet. Around 9:15 or 9:30 p.m., Matteo brought his cash report and gate receipts to Cortez in the scoring booth and then stood behind the back stop to watch the game, as he always did. Matteo stayed until the game ended around 10:00 p.m. Cortez didn't see Matteo leave "but he had to have been there, you know, right after the ball game, a little bit after." Cortez never met Vincent and knew nothing about Matteo's home life.

### Bud Baker

Lieutenant Baker was a sergeant in the Homicide Division on November 11, 1992. He first became involved in the investigation of Vincent Matteo's murder when he and Deputy Chief Jim DeLesdernier drove to Ormund Beach, Florida in early December to pick up Amunson. On the way, the men stopped in Livingston, Louisiana to pick up photographs and a statement from the sheriff there. They arrived in Ormund Beach on Monday, December 7, 1992, and met with Amunson, who at the time was using the alias John Allen Smith.

Baker first identified himself and explained that he had a warrant for Amunson's arrest for murder, and he was there to take Amunson back to Texas. Baker then read Amunson his *Miranda* rights. After Amunson indicated he understood his rights, Baker said he planned to pick Amunson up the next morning and asked if he had anything he

needed to get ready. Amunson said he could be ready in five minutes. Baker did not question him or attempt to question him. At the time, Amunson had "long afro style hair, very curly, and a full beard."

Baker returned the following morning at approximately 5:00 a.m., and the trio departed at approximately 5:30 a.m. Amunson was handcuffed. During the ensuing eighteen-hour drive, they made three stops for gasoline, food and drink, and personal relief. During the trip, Baker asked Amunson if he would be willing to talk to him about the events of the Matteo homicide, and Amunson said he would.

Amunson told Baker that he was hitchhiking along Loop 410 in San Antonio en route from Corpus Christi to Waco when Matteo picked him up. Matteo offered him a job helping him move to an apartment. Although the move was never made, Amunson said, he had stayed at Matteo's home, spent the previous night there, and prepared dinner for Matteo, Vincent, and another guest. According to Amunson, Vincent was very friendly and open and wanted attention, but he was afraid of his father. Amunson also said he had played Monopoly with Vincent for some period of time before Vincent went to his bedroom to watch TV. This was after or during the time Matteo and his guest were preparing to leave. Amunson said that he had had eighteen beers that day; he was an alcoholic; and he intended to leave that evening, but when he told Matteo of his plan, Matteo tried to convince him not to leave at that time. Amunson said Matteo was openly homosexual, and Amunson "didn't play that game."

According to Amunson, Vincent overheard his conversation with Matteo regarding his planned departure, and Vincent also asked, then begged, Amunson not to leave. Amunson said he decided to leave after their Monopoly game was over and to take the VCR after Vincent went into his bedroom. Amunson said he took the VCR and Nintendo game because he needed money. Amunson said he left just before dark, which he thought was around 6:30 p.m., and walked to a nearby bus stop, where he caught the first bus that came by and took it downtown.

Amunson said that he last saw Vincent when he went into his bedroom to watch TV.

When he arrived downtown, Amunson met the person to whom he eventually sold the VCR for $30. When Baker first mentioned the Nintendo game, Amunson didn't recall taking it; later he remembered that he did and said he had left it underneath a bridge near the Bexar County Jail after being dropped off by the people to whom he sold the VCR. He said he left the Nintendo game under the bridge because he realized he was in an area where there were a lot of police, it was late at night, and he did not want to try to explain to a police officer why he was carrying a Nintendo game in a canvas bag at that time of night. It was near the Bexar County Jail that Amunson said he was picked up by a black man and taken to his home, where Amunson spent the night.

Amunson said he spent the next day drinking beer in downtown San Antonio. He called the black man he had met the previous evening and asked if he could again spend the night at his home, but he said no. Amunson eventually spent the night under a bridge or culvert at Interstate Highway 10 and Loop 410 East. He spent some time the next day at a nearby truck stop, trying to catch a ride. Eventually a security guard told him to leave, so Amunson walked to Interstate 10 East and caught a ride to Seguin. A little before dark Amunson was picked up by three young men from Arizona, two of whom were brothers. When asked where he was headed, Amunson said east. Amunson accompanied the young men to Livingston, Louisiana. The group spent Saturday, November 14, 1992, with the brothers' family and that night attended their uncle's birthday party. The next day they headed to Miami, Florida to find construction work in the wake of the hurricane. Amunson said he had spent all of his money in San Antonio, he had no identification, and he had no relatives in Florida. Amunson also told Baker that had he not been identified as someone other than John Allen Smith, he intended to head for New York City and disappear into the crowd.

During their conversation, Baker showed certain photographs of Vincent's body to

Amunson to see what kind of reaction he would get. Amunson showed no anger or grief, which Baker would have expected, nor did he ask any questions as to how Vincent died. Amunson simply shook his head. Amunson was of course aware that he was the primary suspect, but he insinuated to Baker that he needed to look at Matteo because Matteo had mentioned to Amunson that "he had a large amount of insurance on Vincent and that he had a large insurance premium to pay each month on Vincent." Amunson said he had no other information; it was "just a feeling" he had that Matteo was somehow involved.

### John Hearn

Hearn was recalled to identify a glass jar found at Matteo's home. According to Hearn, fingerprints were taken from the jar but they were unknown. The prints were neither Matteo's nor Amunson's. They could have been Vincent's or anyone else's.

### Anthony Matteo

On recall, the only new information provided by Matteo was that, when preparing dinner, Amunson used cans of food he provided. Matteo also identified the jar previously identified by Hearn as Vincent's "bank," which he kept in his bedroom and which had contained approximately $18. According to Matteo, he discovered the jar—empty—on the Monday or Tuesday following Vincent's murder and delivered it to the sheriff's representatives. Matteo did not discover earlier that the jar was empty because his house had flooded.

Matteo also identified on a map of the city the route he took from his home to the San Antonio AIDS Foundation and from the Foundation to the ballpark. According to Matteo, the trip from his home to the Foundation took approximately ten or fifteen minutes, while the trip from the Foundation to the ballpark took him about ten minutes.

On cross-examination, Matteo again denied stating on the night of the murder that he had touched the knife in Vincent's back. He also testified that he did not believe that Henry Lee Bailey had said he was scared of Matteo for various reasons, and he did not

know that Bailey was dying from AIDS and therefore unable to testify.

### J. Albert Acevedo, Jr.

Acevedo was the grand jury foreman in January 1994. Acevedo identified the indictment of Amunson and further testified that the grand jury was unable to ascertain the instrument used to inflict Vincent's head wounds.

### Robert Charles Bux

Dr. Bux, the chief deputy medical examiner for Bexar County, performed the autopsy on Vincent on November 12, 1992. After describing Vincent's injuries, Bux concluded that Vincent was killed somewhere between 5:00 or 5:30 p.m. and 10:00 or 10:30 p.m. Bux believed it most probable that Vincent died at approximately 8:00 or 8:30 p.m.

### Markel Shirley

Shirley lives in Denham Springs, Louisiana. According to Shirley, Amunson arrived at her uncle's house on November 14, 1992 in the company of her two nephews and their friend from Sedona, Arizona. The group was on its way to Homestead, Florida to find construction work. Shirley met the group the following Sunday morning when she went over to her uncle's house. Shirley stayed at her uncle's home, visiting with the men, until that evening when they followed her to her aunt's house, where they were having dinner. Shirley's uncle bought tires for their car and gave them $50. The group went to Shirley's uncle's birthday party that night and then spent the night at the home of Shirley's other aunt and uncle. Shirley identified photographs taken at the birthday party. The photographs depicted members of Shirley's family and Amunson. According to Shirley, Amunson's demeanor was "fantastic"; he was "enjoying himself"; he was "very amicable," charming, and could talk easily with strangers; and "the women had an affinity for him...." Amunson did not seem evasive but entirely normal. Shirley did not believe Amunson drank too much, although her nephews did.

*John Wesley Amunson*

Amunson was twenty-eight years old at the time of trial and testified in his own behalf. According to Amunson, when Matteo picked him up on November 10, he was hitch-hiking to Waco. Amunson had been working in Corpus Christi and had just broken up with his girlfriend, Norma Pena. He was on his way to the home of his ex-wife, Laura Miller, in Lorena, just south of Waco, to get some money to go to Florida, where Amunson was going to try to get construction work in the aftermath of the hurricane.

During their conversation, Matteo asked if Amunson had been married and had children. Amunson responded that he was divorced and had one child, approximately three years old, who lived with his ex-wife. Matteo asked Amunson if he would be interested in some work, specifically helping him move to his new apartment. Amunson told him he couldn't be paid with a check because he was "on the run from the law"—in the previous twelve years, Amunson had been convicted of burglary of a habitation, theft, and unauthorized use of a vehicle, and he was in violation of the terms of his parole when Matteo picked him up. Matteo asked then if Amunson was using another name, and Amunson told him he had used "J.J." before. Matteo said that was what he would call him.

On the way to Matteo's house, the two men stopped and picked up some beer. When they arrived at Matteo's house, Vincent was in the living room doing his homework. While the two men were talking, Vincent frequently interrupted with questions. It appeared to Amunson that Matteo was more interested in talking with him than with Vincent. Matteo was visibly annoyed and told his son to go to his bedroom. When Vincent said "no," Matteo moved towards him, and Vincent cowered. Then Matteo looked at Amunson and started "play wrestling" with Vincent. Matteo then sent his son to his bedroom.

While Matteo fixed dinner, he and Amunson continued talking. After dinner, Amunson played Monopoly with Vincent while Matteo made a telephone call to his bank in Connecticut or Canada. Later, after Vincent had taken his bath and gone to bed, Matteo and Amunson continued their conversation. Approximately thirty to forty minutes later, the two men loaded up some trunks and took them to Matteo's new apartment. On the way home, they picked up more beer. Upon returning to Matteo's home, Amunson took a shower. Later the two men watched TV and continued their conversation. At one point, Amunson asked Matteo about the antique wheelchair. Matteo responded that a lady had given it to him, and it had broken when he was loading it into a truck. Later Matteo told Amunson that he "had a lot of money tied up" in Vincent's life insurance policy.[6]

Amunson denied that he had sexual relations with Matteo. According to Amunson, when Matteo brought up the subject of his homosexuality and asked if Amunson was interested, Amunson said "no," and that he would feel more comfortable if Matteo would just take him back to the highway. Matteo told Amunson that he would not "mess" with him and asked him to stay and help him move; he had no one else to help him. Amunson agreed to stay and help so long as Matteo promised to leave him alone. At trial, Amunson denied that he was either homosexual or bisexual. That night Amunson slept in Matteo's bedroom, while Matteo slept on the couch in the living room.[7]

The next morning Amunson woke up about 10:30 a.m. Matteo and Vincent had already left, but Matteo had left him a note on the coffee table. The note said Matteo would return around 2:30 p.m. and would pick up some beer. Matteo returned around 11:30 a.m. with the beer and told Amunson he had arranged for a truck and another person to help with the moving. Amunson stayed at the house, drinking beer and watching TV.

Around 3:30 p.m., Matteo and his friend, Gilbert Garcia, returned. Vincent, who had

6. Although Matteo denied telling Amunson that he had a life insurance policy on Vincent's life, he did not deny telling Amunson that he "had a lot of money tied up" in Vincent.

7. In light of the standard of review, we must resolve these conflicts in Matteo's and Amunson's testimony in favor of the prosecution.

also gotten home from school, went into his bedroom to do his homework. Matteo asked Amunson to prepare dinner, as they had discussed the previous evening. At approximately 3:00 or 3:30 p.m., Amunson began to cut and then fry a chicken Matteo had thawed and fix the canned spinach he had in his bag. While Amunson was preparing dinner, Matteo and Garcia stayed in Matteo's bedroom.

During dinner, Matteo told Amunson that he had not been able to get a truck, and he was going to leave for thirty to forty minutes to drop Garcia off and run by his new apartment. When he returned, they could start moving Matteo's stuff. According to Amunson, Garcia stayed through dinner but did not eat; he was acting "real strange"—"real paranoid or real scared." However, the only conversation Amunson had with Garcia was when Garcia asked Amunson about his tattoos.

When Matteo and Garcia were leaving, around 5:30 p.m., Amunson "didn't like the feel of the situation," so he decided to leave and told Matteo he probably would not still be there when Matteo returned. Amunson denied that he had told Matteo that he would stay through the garage sale that Saturday.[8] He also testified that, as far as he knew, Matteo had not received a phone call instructing him to go to work, and he was not going to work when he left that evening.[9]

After Matteo and Garcia left, Amunson and Vincent played Monopoly for approximately one-half hour. When Vincent kept asking Amunson to stay, Amunson said "no." Vincent then got mad and stormed into his bedroom. Amunson waited for Matteo for about thirty to forty-five minutes. When Matteo didn't show by about 6:00 or 6:30 p.m., Amunson packed up the VCR and Nintendo and left through the back door. Amunson took the VCR and Nintendo because he needed money; at the time, he only had $3 to $4. By the time he left, Amunson had consumed approximately eighteen beers. Amunson denied, however, that he blacked out at any time on November 11. Amunson

also denied taking the $18 that was in Vincent's "bank."

Unfamiliar with the area, Amunson wandered around for approximately thirty minutes looking for the bus stop near Matteo's home. He finally boarded a bus around 7:15 or 7:30 p.m. After walking around for a while, Amunson met Lehman at the bus stop at the corner of East Houston and South St. Mary's. It was about 10:00 p.m. Amunson asked Lehman if he would watch his bags while he got a beer. Lehman agreed. Ultimately, Amunson sold the VCR to Lehman's son-in-law for $30. After driving to a cash machine and getting the money, Lehman and his son-in-law dropped Amunson off on Commerce Street. Thereafter, Amunson walked around downtown San Antonio drinking beer. He left the Nintendo under a bridge because he was afraid the police would stop him and find that he had stolen property. That night, Amunson spent the night at the home of a black man he had met that evening.

The next evening Amunson made his way back to the truck stop where Matteo had picked him up. He first got a ride to Seguin in a small red pickup. Then two brothers from Arizona and their friend picked him up. They said they could take him all the way to Florida because they were going there, too, to look for construction work in the wake of the hurricane. On the way, the group went to a birthday party for the brothers' uncle in Denham Springs, Louisiana. At the time, because he was violating his parole, Amunson used an alias, John Allen Smith.

A few days later, the group proceeded to Florida. Outside of Daytona, the group—with Amunson at the wheel—was stopped for an expired license plate, and Amunson was ultimately arrested for driving while intoxicated. Amunson, who was still using the name "John Allen Smith," was sentenced to thirty days in jail. On December 7, 1992, Lieutenant Bud Baker arrived in Florida to take Amunson back to Texas.

While in the Bexar County jail, Amunson requested that he be transferred to the homosexual unit. According to Amunson, in-

8. *See supra* n. 7.

9. *See supra* n. 7.

mates were harassing him because he was charged with murdering a young boy.[10] At trial, Amunson repeatedly denied that he had killed Vincent.

### Shirley Schuster

Shirley Schuster is a professional nurse who in 1992 worked a few doors down from Matteo. Schuster cared for Sam Davidson and his adoptive mother, Lorna Wonsik, who were both in wheelchairs. Matteo visited Davidson frequently, referring to him as his "brother" and to Mrs. Wonsik as his "mom" and Vincent's "grandmother." Vincent also visited Mrs. Wonsik's home several times a week.

Schuster testified that she overheard many conversations between Matteo and Davidson in which Matteo talked about Vincent. According to Schuster, Matteo said "the damn kid ties him down;" when he was old enough, Matteo would throw him out of his house and his life. Schuster also testified that, when Vincent came to use the bathroom at Mrs. Wonsik's, Vincent told her that on several occasions Matteo locked him out of the house for a couple of hours at a time. Finally, Schuster testified that she had seen marks and bruises on Vincent. However, because the trial judge sustained the State's hearsay objection, Schuster was not permitted to relate what Vincent told her as to the origin of his injuries. Finally, after the trial judge sustained another of the State's hearsay objections, Schuster testified that she felt someone did not want her to talk about the conversations she had overheard. Like Lehman, Schuster called the Bexar County Sheriff's Office after seeing the composite on TV. She, however, told them the composite looked like Anthony Matteo.

### Patrick Skillman

At the time of trial, Lieutenant Skillman worked in the Classification Section of the Bexar County Sheriff's Department and was its custodian of records. According to Skillman, a report was made on December 14, 1992 regarding a housing incident involving Amunson. According to the report, Amun-son said he was homosexual and had been since entering the jail, but he had failed to mention it to anyone. Amunson requested transfer to the Homosexual Unit. According to another report, when Amunson was interviewed on December 15, 1992, he indicated he had a homosexual lover and wanted to be transferred to the Homosexual Unit to be with his lover. Amunson was later transferred to the Homosexual Unit. Skillman also testified that, according to discipline reports dated July 26 and September 25, 1994, Amunson was written up for kissing and fondling another inmate.

On cross-examination, Skillman agreed that one way to get transferred to the Homosexual Unit was to claim to be a homosexual, and he had no personal knowledge as to whether Amunson was a homosexual. Skillman further testified that homosexual inmates are treated fairly, and he denied that his department would transfer a homosexual to the Homosexual Unit to be with a lover.

### Discussion

As demonstrated by the foregoing, the only evidence indicating Amunson's guilt is the circumstantial evidence recited by the majority, and there is substantial evidence raising reasonable doubt. For instance, there is no evidence that Amunson had a motive to kill Vincent—an act of violence and brutality totally inconsistent with his previous convictions for burglary, theft, and unauthorized use of a vehicle. If Vincent had walked in on Amunson while he was stealing the VCR and Nintendo, would not Vincent's wounds be somewhere other than the back of his head and his back? And if Amunson's motive was to steal the VCR and Nintendo so he could sell them and get some money, why would he wait until Vincent came home? Why would he not have stolen the items when he was alone in the house from 9:00 a.m. to mid-afternoon?

Balanced against the absence of evidence as to Amunson's motive for murdering Vincent is the evidence suggesting that Matteo had not only the opportunity to kill Vincent sometime between 10:00 p.m. and 10:30 p.m., consistent with Dr. Bux's minimum estimate

---

**10.** *See supra* n. 7.

of the time of death, but also a stronger motive for murdering Vincent than did Amunson; Matteo stood to gain not only a substantial sum of money but also his freedom.

And if Amunson killed Vincent, why were his fingerprints not found on the knife or Vincent's "bank"? Is it really reasonable to assume he would have wiped his prints off the knife and "bank" but not the Monopoly cards and beer and food cans? For that matter, whose fingerprints *were* on Vincent's "bank"? And where was Gilbert Garcia? Finally, how did Amunson know about the life insurance policy Matteo took out on Vincent's life if Matteo did not tell him? And why would Matteo tell a hitchhiker like Amunson about the policy?

In short, the evidence in this case, as well as the gaps in the evidence, are far less inculpatory and raise far more doubt as to Amunson's guilt than did the evidence in *Turner*. The evidence in *Turner* was constitutionally inadequate; the evidence in this case is even more so.

### CONCLUSION

No remotely compassionate person could remain unmoved by the monstrous crime in this case. An innocent child was brutally and senselessly murdered. Such a horrible crime cries out for punishment and retribution. For this reason, I can fully understand and sympathize with the overwhelming psychological need to convict. But in light of the questions and reasonable doubts raised by the evidence and lack of evidence in this case, I simply cannot agree that the evidence, when viewed as a whole and in the light most favorable to the prosecution, establishes with "near certitude" that it was Amunson who murdered Vincent Matteo. In my view, any rational person who is able to temporarily suspend the pain and horror this crime necessarily generates must have doubts and suspicions not only with respect to Amunson but also with respect to Matteo and Garcia. Nor does this record exclude the very real alternative that Vincent was murdered by none of these men but by someone else. As a result, I simply cannot agree that this record estab-

lishes with near certainty that John Wesley Amunson murdered Vincent Matteo.

Nor can I agree to "split the baby," as the majority effectively does by reversing and remanding this case for a new trial. If the evidence is legally insufficient to support Amunson's conviction, he is constitutionally entitled to his freedom; he cannot legitimately be made to suffer a second trial. This is simply not a case of prosecutorial incompetence; the State made the best case it can. It is just that the State's best case is insufficient as a matter of federal due process. Accordingly, I would reverse the judgment and instruct the trial court to enter a judgment of acquittal.

GREEN, Justice, dissenting on refusal to grant En Banc reconsideration, joined by DUNCAN, J.

A panel member requested en banc review of the panel decision. A majority of the court refused to reconsider the panel decision. I respectfully dissent from the denial of en banc reconsideration.

In my opinion, this case should be decided on the basis of the *Jackson v. Virginia* standard of evidentiary review. 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The majority, however, applies language from *Clewis* as "clarifying and explaining" *Jackson* in articulating what appears to be a new standard of review. *Clewis v. State*, 922 S.W.2d 126 (Tex.Crim.App.1996). But *Clewis* is suspect for at least two reasons. First, as of this writing it has been on motion for rehearing for over three months and it is far from certain that it will remain in its present form (particularly with respect to some of its footnote language). Second, to the extent *Clewis* purports to apply a "no evidence" standard of review, or that the majority reads it that way, it conflicts with *Jackson* and is wrong.

*Jackson* establishes the constitutional floor as the minimum due process requirement for evidentiary review. It is *not* a "some evidence" standard; that is, it is not a pure legal question of whether there is more than a scintilla of evidence to support the verdict. The *Jackson* standard carries a much greater evidentiary burden than traditional "no

evidence"; it is required that the evidence be sufficient to establish guilt beyond a reasonable doubt. If all that were required to sustain a guilty verdict was "some evidence," practically anyone could be convicted.

Moreover, *Jackson* requires that *all* the evidence be considered in the analysis, not just the evidence tending to support the verdict. The mistake made by the majority is that it interprets *Clewis* to mean that "only evidence supporting the verdict is ultimately considered." That is contrary to what I understand *Jackson* to require and it results in a departure from the constitutional requirement that guilt be established beyond a reasonable doubt. As I read *Jackson*, it requires that *all* the evidence is to be considered, including any evidence supporting innocence, but that deference is to be given to the jury verdict. That is, the trier of fact is given responsibility "fairly to resolve conflicts in the testimony, to weigh evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789. In other words, rather than acting as a second jury and substituting its judgment for that of the trier of fact, the appellate court reviews the evidence as it has already been weighed by the jury. Upon that comprehensive evidentiary base, it must then be determined whether *any* rational trier of fact could have found the defendant guilty beyond a reasonable doubt.

It is clear to me from reading the majority and dissenting opinions that the only evidence pointing to Amunson's guilt in the murder is circumstantial, and it consists of the basic facts 1) that he had the opportunity, 2) that he burglarized the decedent's home on the night of the murder (the theory being that he committed the murder to eliminate a witness to the burglary), and 3) that he ran (but this fact could apply as equally to the burglary as to the murder). The question to me, then, is whether these facts, especially when considered with the lack of certain evidence, can rationally be considered evidence beyond a reasonable doubt that Amunson committed the murder.

The evidence being circumstantial, the jury had to have drawn certain inferences from the facts to arrive at the ultimate conclusion that Amunson was guilty of murder. But to be valid, the inferences had to be *reasonably* drawn from the basic facts. And I frankly do not believe any such inferences can be reasonably drawn from the pertinent facts established in this case. The dissent clearly articulates the reasons why.

The successful prosecution of Mr. Amunson under this state of the evidence cannot affect our duty to properly apply constitutional evidentiary safeguards as established by the U.S. Supreme Court in *Jackson*. Accordingly, if *Jackson* is the proper standard, then I agree with the dissent that an acquittal is necessitated.